## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| Gulf Restoration Network, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 14-cv-01773 (APM) |
| ) | |
| Sally Jewell ) | |
| Secretary of the Interior, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Plaintiff Gulf Restoration Network brought this action under the Administrative Procedure Act challenging the decision of various federal agencies to approve the Gulf State Park Enhancement Project for inclusion in early restoration efforts responsive to the 2010 Deepwater Horizon oil spill.  Plaintiff alleges that the decision to approve the project, which is to be located in the State of Alabama's Gulf State Park, violated the Oil Pollution Act of 1990 and the National Environmental Policy Act of 1969.

Before the court is Defendants' motion to transfer the case to the United States District Court for the Southern District of Alabama.  After considering the parties' submissions and the relevant law, the court concludes that in the interest of justice, particularly the interest of Alabama's citizens in deciding this controversy at home, this matter shall be transferred.

## II.   BACKGROUND

### A.  The Parties

Plaintiff Gulf Restoration Network ("Gulf Restoration") is a non-profit organization, based in New Orleans, Louisiana, and incorporated under the laws of the State of Louisiana. Gulf Restoration endeavors "to unite and empower people in protecting and restoring the Gulf [of Mexico]'s natural resources."  Amended Complaint, ECF No. 12, ¶ 13 [hereinafter Am. Compl.]. Plaintiff maintains satellite offices in Madison, Mississippi, and St. Petersburg, Florida.  It does not have an office in the District of Columbia.  Gulf Restoration "has members throughout the states bordering the Gulf of Mexico and nationwide," including "numerous members who live, work, and take advantage of the tremendous outdoor recreation opportunities in and around Gulf State Park and otherwise in the vicinity of the" Gulf State Park Enhancement Project (the "Project").  *Id.* ¶¶ 13-14.  Gulf Restoration alleges that the Project will harm its members' enjoyment of the Park.  *Id.* ¶ 14.

Defendants the United States Department of the Interior ("DOI"), the National Oceanic and Atmospheric Administration ("NOAA"), the Environmental Protection Agency ("EPA"), and the United States Department of Agriculture ("USDA") (collectively, the "Defendant Agencies") serve as "Federal trustees" under the Oil Pollution Act of 1990 ("OPA") with respect to the 2010 Deepwater Horizon oil spill (the "Spill").  *Id.* ¶ 4.  Defendants Sally Jewell, Kathryn Sullivan, Gina McCarthy, and Tom Vilsack are sued by Plaintiff in their official capacities as leaders of the Defendant Agencies—Defendant Jewell is Secretary of the Interior, Defendant Sullivan is Undersecretary of Commerce for Oceans and Atmosphere and the NOAA Administrator, Defendant McCarthy is the Administrator of the EPA, and Defendant Vilsack is Secretary of Agriculture.  *Id.* ¶¶ 15-18.  All Defendants are based in the District of Columbia.  *Id.* ¶ 12.

2

Plaintiff alleges that Defendants violated both OPA and the National Environmental Policy Act of 1969 ("NEPA") by approving the Project without adequately considering alternative early restoration projects. *See id.* ¶¶ 76-84. Plaintiff further alleges that Defendants violated OPA by failing to document how the Project will help make Alabama whole from the Spill, *see id.* ¶¶ 95-106, and violated NEPA by failing to justify the need for, or the benefits anticipated from, the Project, as well as insufficiently assessing its environmental impacts, *see id.* ¶¶ 85-94, 107-14.

### B. The Decisions at Issue

The process that led to the selection and approval of the Project took place over a three-and-half-year period and involved multiple federal and state actors, as well as multiple public comment periods. The complex and diffuse nature of the decision-making process requires the court to go into some detail about how the Project came to be. The facts set forth below are derived from the parties' pleadings, representations made at the hearing on Defendants' motion to transfer, and post-hearing submissions ordered by the court.

#### 1. The Spill and Early Restoration Efforts

On April 20, 2010, the Deepwater Horizon, an offshore drilling rig operated by British Petroleum ("BP"), caught fire, exploded, and sank in the Gulf of Mexico. *See* Defs.' Mot. to Transfer Venue, ECF No. 7 [hereinafter Mot.], Ex. 1, Record of Decision for the Deepwater Horizon Oil Spill: Final Programmatic and Phase III Early Restoration Plan and Early Restoration Programmatic Environmental Impact Statement (Phase III ERP/PEIS), at 3 [hereinafter ROD]. Over the next 87 days, approximately five million barrels of oil and an undetermined amount of natural gas discharged into the Gulf of Mexico. *Id.* The Spill was "one of the largest . . . in U.S. history," *id.*, and, according to Plaintiff, "caused environmental damage on a scale and of a complexity never before witnessed in the history of American oil production," Am. Compl. ¶ 1. It

3

affected natural resources located throughout the Gulf of Mexico and in coastal areas of Florida, Louisiana, Mississippi, Texas, and most pertinent to this action, Alabama (collectively, the "Affected States").  ROD at 3.

The Spill and its environmental impacts produced a sweeping response involving a multitude of federal- and state-level actors located in several states and the District of Columbia. The early restoration process was governed by OPA, which provides a mechanism for assigning liability for removal costs and damages caused by oil spills.  33 U.S.C. § 2702(a).  Under OPA, President Obama designated the Defendant Agencies as "Federal trustees," and the Affected States' governors designated a total of 13 state agencies as "State trustees" (collectively, the Trustees").[1]  ROD at 1-2.  The Trustees were responsible for "assess[ing] natural resource damages" and "develop[ing], and implement[ing] a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resource" harmed by the Spill. 33 U.S.C. § 2706(c)(1).  The State trustees included the Alabama Department of Conservation and Natural Resources and the Geological Survey of Alabama (collectively, the "Alabama Trustees").[2]

On April 19 and 20, 2011, representatives from DOI, NOAA, 12 State trustees, the United States Department of Justice ("DOJ"), and BP executed a "Framework for Early Restoration Addressing Injuries Resulting from the Deepwater Horizon Oil Spill."  *See* Mot., Ex. 2, ¶ 1 [hereinafter Framework Agreement].  The Framework Agreement stipulated that the Trustees and BP will "work together to complete identification" and "implementation of early restoration

---

[1] EPA, USDA, and the Florida Fish and Wildlife Conservation Commission were not initially designated as Trustees, but were added thereafter.  *See* Mot. at 3 n.1.

[2] The "State trustees" also include five Louisiana agencies (The State of Louisiana's Coastal Protection and Restoration Authority; Louisiana Oil Spill Coordinator's Office; Louisiana Department of Environmental Quality; Louisiana Department of Wildlife and Fisheries; Louisiana Department of Natural Resources), three Texas agencies (Texas Parks and Wildlife Department; Texas General Land Office; Texas Commission on Environmental Quality), two Florida agencies (Florida Department of Environmental Protection; Florida Fish and Wildlife Conservation Commission), and one Mississippi agency (Mississippi Department of Environmental Quality).  ROD at 1-2.

projects that will provide meaningful benefits to accelerate restoration in the Gulf as quickly as practicable, with the goal of beginning projects in 2011 and 2012." *Id.* ¶ 2.  BP agreed to provide $1 billion to fund the early restoration projects. *Id.* ¶ 4.[3]

### 2.  The Project's Selection

After the Framework Agreement's execution, the Alabama Trustees commenced an "initial screening process" in which they solicited input from the public and considered several hundred potential early restoration projects.  *See* Mot., Ex. 3, Programmatic and Phase III Early Restoration Plan and Early Restoration Programmatic Environmental Impact Statement, at 1, 55 [hereinafter EIS]; *see also* Mot. Hr'g Tr. 8:22-9:4, Mar. 3, 2015.  The "Alabama Trustees considered a range of project types to determine how best to proceed with Early Restoration projects aimed at restoring lost recreational use," including "land acquisition, smaller scale beach and boating access improvements, and development of nearshore artificial diving and fishing reefs."  EIS at 57.  The Gulf State Park Enhancement Project was among the projects that the Alabama Trustees identified. The Project contemplated the construction of a hotel, a convention center, and facilities for environmental research and education, along with various recreational and ecological enhancements.  *Id.* at 55-56.  All aspects of the Project were to be located in Gulf State Park, which is located on state-owned land in southern Alabama on the coast bordering the Gulf of Mexico. *Id.*

---

[3] In opposition to Defendants' motion, Plaintiff asserts that the Framework Agreement, and the fact that three of its signatories—Kenneth L. Salazar (DOI), Jane Lubchenco (NOAA), and Thomas J. Perrelli (DOJ)—are based in the District of Columbia, evidences a connection between the District of Columbia and the decision to approve the Project. *See* Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Transfer Venue, ECF No. 9, at 7 [hereinafter Pl.'s Opp'n].  The court is not persuaded by this argument.  Plaintiff challenges the decision to approve the Project; it does not challenge the decision to execute the Framework Agreement.  The Framework Agreement provides necessary context for the decision at issue and thus is relevant to this discussion, but the physical location of its signatories does not bear on the court's decision regarding Defendants' motion.

The Alabama Trustees then presented the Project to the "Trustee Council."  EIS at 1; *see also* Hr'g Tr. 9:2-4.  The Trustee Council consisted of representatives from each federal and state Trustee.  Hr'g Tr. 6:24-7:2.  Its "day-to-day" work was undertaken by an Executive Committee, *id.* at 7:2-4, the members of which performed "some technical screening" of proposed early restoration projects, negotiated with BP regarding each project, and "at the end of the day decided to include projects" in early restoration efforts, *id.* at 9:8-11.  Each Federal trustee and each Affected State appointed a primary and an alternate representative to the Executive Committee. *Id.* at 7:2-7.  Fourteen individuals served as either a primary or alternate representative of one of the Federal Agencies during the period when the Trustee Council likely discussed the Project.  *See* Notice of Filing Agency Designations & Meeting Mins., ECF No. 14, at 1-2 [hereinafter Defs.' Suppl.].  During the relevant time period, nine of those individuals were based in the District of Columbia, four were based outside the District of Columbia,[4] and one was based both inside and outside the District of Columbia.[5]  The parties did not present evidence as to the location of each state's primary and alternate representative, but the court assumes each was based in the state that he or she represented.  The Executive Committee did not have a permanent location; it often operated "virtually."  Hr'g Tr. 7:8-14.  It met on 12 occasions during the relevant period; none of the meetings were held in the District of Columbia.[6]  *Id.* at 9:13-15.

The Trustee Council approved early restoration projects in several phases.  *See* ROD at 4. After approving Phase I and Phase II, the Trustee Council announced in May 2013 its intent to

---

[4] Cythina Dohner (DOI) was based in Atlanta, Georgia; Craig O'Connor (NOAA) was based in Seattle, Washington; Ben Scaggs (EPA) was based in Stennis Space Center, Mississippi; and, Homer Wilkes (USDA) was based in Madison, Mississippi.  Defs.' Suppl. at 1-2.

[5] Michele Laur (USDA) was based in the District of Columbia from December 2012 to May 2013, and in Madison, Mississippi, and Tampa, Florida, thereafter.  *Id.*

[6] Defendant submitted the minutes of seven Executive Committee meetings at which the Project was discussed.  *See* Defs.' Suppl., Ex. 2.  Two of the minutes note the meeting's physical location—Shepherdstown, West Virginia, and San Antonio, Texas—while the other five do not.  *Id.*

move forward with Phase III, which included the Project and 43 other early restoration projects. Hr'g Tr. 7:14-21. The document announcing the Project's inclusion in Phase III explained that, "[w]hile all projects proposed to be implemented in Alabama are being put forth by [all] Trustees, the specifics of each project in this region were developed and brought to the Trustees for approval by 'implementing trustees.'" EIS at 1. The "implementing trustee" for the Project was the State of Alabama, *id.*, specifically the Alabama Department of Conservation and Natural Resources. Mot., Ex. 4, Stipulation Regarding Early Restoration Project for the Deepwater Horizon Oil Spill—Gulf State Park Enhancement Project, at 2 [hereinafter Stipulation].

On May 2, 2013, the Alabama legislature passed SB 231, a bill "that authorize[d] the Alabama Convention Center Project." Am. Compl. ¶ 50 (citing S.B. 231, 2013 Leg., Reg. Sess. (Ala. 2013)).

### 3. The Project's Environmental Impact Statement

Selection and approval of the Project also involved the preparation of an "environmental impact statement,"[7] as required by NEPA. *See* 42 U.S.C. § 4332(2)(C).

On June 4, 2013, in accordance with OPA and NEPA guidelines, the Trustees "published a Notice of Intent to Prepare a Programmatic Environmental Impact Statement for an Early Restoration Plan and Early Restoration Project Types, and to Conduct Scoping Meetings." ROD at 4. The publication of that notice began an 18-month "environmental review" period, which culminated in October 2014. Hr'g 16:12-17.

---

[7] An environmental impact statement, which "all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment," must address the following: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

The first stage of a NEPA-mandated environmental review is a "scoping period."  During that stage, the Trustees held public meetings with the aim of identifying "public and stakeholder issues of concern . . . ."  *Id.* at 16:18-20.  The scoping period for the Phase III early restoration projects, including the Project, involved six public meetings—five in the Affected States and one in the District of Columbia.  *See* ROD at 4; *see also* Defs.' Reply in Supp. of Mot. to Transfer Venue, ECF No. 10, at 4 [hereinafter Defs.' Reply].  The scoping period ended on August 2, 2013.  ROD at 4.  On December 6, 2013, the Trustees released a draft version of the Project's Environmental Impact Statement (the "EIS").  *Id.*  The draft EIS set forth, among other things, information about the Trustees' compliance with NEPA and OPA.  The draft's release initiated a second public comment period, which closed on February 19, 2014.  *Id.*  During that period, nine public meetings were held concerning the draft EIS in Mississippi, Louisiana, Texas, Florida, and Alabama.  *Id.*; *see also* Defs.' Reply at 4.  In June 2014, the Trustees released the final EIS.  *See generally* EIS.

The DOI prepared the draft and final EIS in cooperation with "NOAA, EPA, and USDA, and Trustees from Alabama, Florida, Louisiana, Mississippi, and Texas . . . ."  ROD at 2.  The United States Fish and Wildlife Service ("FWS"), an agency within DOI, and specifically FWS' Region 4 office in Atlanta, Georgia, supervised the preparation of the EIS.  Hr'g Tr. 17:19-21.  Nanciann Regaldo of FWS's Atlanta office was designated as the point of contact for "information concerning" the EIS.  ROD at 258.  FWS did not act alone, however.  The EIS' preparation involved 17 "cooperating agencies" and 189 individual "preparers," located throughout the United States.  *See* Hr'g Tr. 17:23-18:5, 18:16-18.

### 4. The Project's Final Approval

The Project received its final approval on October 2, 2014, when the Trustees (1) issued the Record of Decision (the "ROD")—the final administrative record—and (2) executed an agreement with BP titled "Stipulation Regarding Early Restoration Project for the Deepwater Horizon Oil Spill—Gulf State Park Enhancement Project" (the "Stipulation"). The Stipulation set forth the logistics of BP's funding of the Project as well as the Project's terms and conditions. *See generally* Stipulation. Cythina Dohner (DOI), Craig O'Connor (NOAA), Kenneth Kopocis (EPA), and Ann C. Mills (USDA) signed both the ROD and the Stipulation on behalf of the Federal trustees. *See* ROD 259-62; Stipulation at 9. These signatories were, at the time, based in Atlanta, Georgia, *see* Mot., Ex. 5, Aff. of Kevin Reynolds (Nov. 21, 2014); Seattle, Washington, *see* Mot., Ex. 6, Aff. of Craig R. O'Connor (Nov. 18, 2014); the District of Columbia; and the District of Columbia, respectively. Silver Spring, Maryland-based David Westerholm and Eileen Sobeck of NOAA, *see* Mot., Ex. 6, Aff. of David Westerholm (Nov. 19, 2014), Ex. 7, Aff. of Eileen Sobeck (Nov. 18, 2014), both signed the ROD, but not the Stipulation, *see* ROD at 261. District of Columbia-based Sam Hirsch (DOJ) and two representatives of BP signed the Stipulation, *see* Stipulation at 9, 15, but not the ROD. Each document was also signed by officials from the Affected States. *See* ROD at 263-67; Stipulation at 10-14. On behalf of Alabama, N. Gunter Guy, Jr. (Alabama Department of Conservation and Natural Resources) and Berry H. Tew, Jr. (Geological Survey of Alabama) signed the Stipulation, *see* Stipulation at 10, and Mr. Guy signed the ROD, *see* ROD at 263.

## III. LEGAL STANDARD

Defendants have moved to transfer this case to the Southern District of Alabama under 28 U.S.C. § 1404(a). Mot. at 5. Section 1404(a) authorizes a court to transfer a civil action to any

other district where it could have been brought "for the convenience of parties and witnesses, in the interest of justice . . . ." 28 U.S.C. § 1404(a).  Transfer may be appropriate "[e]ven where a plaintiff has brought its case in a proper venue."  *Preservation Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 53 (D.D.C. 2012).  A case should not be transferred, however, "simply because another forum, in the court's view, may be superior to that chosen by the plaintiff."  *The Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d. 10, 12 (D.D.C. 2000) (citation omitted) (internal quotation marks omitted).  District courts have "discretion . . . to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack,* 376 U.S. 612, 622 (1964)).

Under Section 1404(a), the moving party bears the burden of establishing that transfer is proper.  *Trout Unlimited v. U.S. Dep't. of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (citations omitted).  This burden encompasses two distinct steps.  First, a movant must establish that the plaintiff originally could have brought the action in the proposed transferee district.  *See Van Dusen*, 376 U.S. at 622.  Second, a movant must show that "considerations of convenience and the interest of justice weigh in favor of transfer" to the transferee court.  *Schmidt v. Am. Physics Inst.*, 322 F. Supp. 2d 28, 31 (D.D.C. 2004) (citation omitted).  The second inquiry "calls on the district court to weigh in the balance a number of case-specific factors," which reflect the public and private interests at stake.  *Stewart Org.*, 487 U.S. at 29.  These factors are not statutory; rather, "they are intended to elucidate the concerns implied by the phrase 'in the interest of justice.'"  *Stand Up for California! v. U.S. Dep't of Interior*, 919 F. Supp. 2d 51, 64 (D.D.C. 2013) (citing *Stewart Org.*, 487 U.S. at 29).

The private-interest factors that courts typically consider, and that this court will consider here, include: (1) the plaintiff's choice of forum; (2) the defendants' choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof. *Trout Unlimited*, 944 F. Supp. at 16. The public-interest factors include: (1) the transferee court's familiarity with the governing laws; (2) the relative congestion of the dockets of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *Id.*

## IV.  ANALYSIS

This case could have been brought in the Southern District of Alabama, and the court has considered the relevant private- and public-interest factors. Ultimately, the localized interest of Alabama's citizens in having this controversy decided in Alabama tips the scales in favor of transfer.

### A.  Original Venue

Both parties agree that this case originally could have been brought in the Southern District of Alabama. Under 28 U.S.C. § 1391, venue in a suit against the federal government is proper in any district in which "a substantial part of property that is the subject of the action is situated . . . ." 28 U.S.C. § 1391(e)(1)(B). Here, venue is proper in the Southern District of Alabama because the Project is located there.

### B.  Private-Interest Factors

#### 1.  *Plaintiff's choice of forum*

Plaintiff's opposition to transfer focuses greatly on the deference its choice of forum is owed. A plaintiff's choice of forum is generally afforded "substantial deference," *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 128 (D.D.C. 2001), but that deference is not

unyielding.  The amount of deference is diminished "where the plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter." *Trout Unlimited*, 944 F. Supp. at 17 (citation omitted) (internal quotation marks omitted); *see also Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d. at 13 ("The degree of deference accorded to [a plaintiff's] choice of forum therefore depends upon the nexus between [a plaintiff's] chosen forum . . . and the dispute over the [action at issue].").  The amount of deference also is diminished where a plaintiff is not a resident of its chosen forum.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981) ("When the plaintiff has chosen the home forum, it is reasonable to assume that the choice is convenient; but when the plaintiff or real parties in interest are foreign, this assumption is much less reasonable and the plaintiff's choice deserves less deference.").[8]

Here, Gulf Restoration's choice of forum is afforded *some* deference because of the District of Columbia's meaningful ties to the Project, but not "substantial deference" because Gulf Restoration is not a resident in this forum.  The District of Columbia's factual connection to the dispute cannot be doubted.  The Defendant Agencies, all of which are based in the District of Columbia, served as Trustees with respect to the Project; nine District of Columbia-based officials served as primary or alternate representatives of Defendant Agencies on the Trustee Council's Executive Committee; one public meeting during the scoping period occurred in the District of Columbia; Defendant Jewell was directly and personally involved in "announc[ing] the selection of the Phase III early-restoration projects at a press conference in Louisiana"; and five District of

---

[8] In *Piper Aircraft*, the U.S. Supreme Court analyzed the doctrine of forum non conveniens, not statutory venue transfer under section 1404.  *Piper Aircraft* is nevertheless binding on this court's transfer analysis because "Section 1404(a) finds its origins in the doctrine of [f]orum non conveniens." *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978) (citation omitted).  The Supreme Court has recognized that section 1404(a) is a revision as well as a codification of the forum non conveniens doctrine, which requires a "lesser showing of inconvenience" to transfer than that required for a forum non conveniens dismissal.  *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955); *see also Savoy Indus.*, 587 F.2d at 1154.

Columbia-based officials[9] provided necessary final approval[10] of the Project by signing the ROD, the Stipulation, or both.

But Plaintiff is not a District of Columbia resident.  It is headquartered in Louisiana and maintains satellite offices in Mississippi and Florida only.  This court consistently has shown less deference to entities that chose this forum but did not reside here.  *See, e.g.*, *Pres. Soc'y*, 893 F. Supp. 2d at 54 (limiting the deference afforded to plaintiffs "based in Charleston" that did not allege to have "offices in the District of Columbia or members who live here"); *Shawnee Tribe v. U.S.*, 298 F. Supp. 2d 21, 25 (D.D.C. 2002) (giving diminished deference to plaintiff Shawnee Tribe's choice of forum because, "despite the Tribe's assertion that its individual members live across the United States, the Tribe's reservation is, in fact, located in Kansas"); *cf. Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 11 (D.D.C. 2007) (granting "a strong presumption in favor of the chosen forum" where "[o]f the five plaintiffs that filed suit . . . at least one . . . has its headquarters in the District of Columbia, and is thus clearly a resident of this District"); *Wilderness Soc'y*, 104 F. Supp. 2d at 14 (affording substantial deference where "[f]our of the [eight] plaintiffs are headquartered in Washington, D.C. and two others have offices here").  Notably, in another case, a member of this court decided that Gulf Restoration was "not entitled to this Court's deference" because it "is headquartered in New Orleans, Louisiana, and maintains only one satellite office, which is located in the Middle District of Florida."  *Van Antwerp*, 523 F. Supp. 2d at 11 n.3.

---

[9] The number of District of Columbia-based officials includes Mr. Westerholm and Ms. Soebeck of NOAA, both of whom were based in Silver Spring, Maryland.  Other courts in this district have considered a party's contacts to the District of Columbia to include residence in a nearby suburb.  *See, e.g.*, *Trout Unlimited*, 944 F. Supp. at 17 (finding one of the plaintiff's Northern Virginia residence to be "the only [relationship] this suit bears to the District of Columbia").

[10] At oral argument, Defendants' counsel conceded that "at the end of the day, I think you would need all trustees to say yes for a project" in order for it to go forward.  Hr'g Tr. 42:6-7.

Gulf Restoration argues that a "[p]laintiff's choice of forum is usually accorded great deference, unless the plaintiff chooses a forum that is not his home *and* [the forum] has no substantial connection to the subject matter of the action," contending that the standard is "typically conjunctive." Hr'g Tr. 34:2-6 (emphasis added). The court disagrees. Although there are cases that use the conjunctive "and" when discussing deference owed to a plaintiff's chosen forum, *see Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179-80 (D.D.C. 2009) ("When there is only an 'attenuated' connection between the controversy and the plaintiff's chosen forum and . . . that forum is not the plaintiff's home forum, the deference afforded to the plaintiff's choice is diminished.") (citations omitted), to the extent that those cases establish a conjunctive standard—and it is not at all clear that is what they do—they cannot be squared with *Piper Aircraft*. In *Piper Aircraft*, the Supreme Court affirmed a district court's ruling that the presumption in favor of a plaintiff's chosen forum "applies with less force when the plaintiff or real parties in interest are foreign." 454 U.S. at 266. The Court did not limit the diminished presumption only to those cases where there was also little or no factual nexus to the chosen forum. Thus, even though Plaintiff has shown meaningful ties between the District of Columbia and the decision to approve the Project, because Plaintiff does not reside here, the court treats Plaintiff's choice of forum with some but not substantial deference.

### 2. *Defendants' choice of forum*

Defendants' choice of forum supports transfer in this case and to some degree counterbalances the diminished deference owed to Plaintiff's choice of forum. A defendant's "choice of forum must be accorded some weight" if the defendant presents legitimate reasons for preferring to litigate the case in the transferee district. *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 48 (D.D.C. 2006). In Administrative Procedure Act ("APA") cases, a defendant's

14

choice of forum deserves "some weight" where the harm from a federal agency's decision is felt most directly in the transferee district.  *See id.* at 46-47.  Here, as the court discusses below, *see infra* Part IV.C., the economic and environmental impacts of the Project will be felt most acutely in the Southern District of Alabama.  Defendants' choice of forum is therefore afforded some weight.

### 3.  *Where the claim arose*

The third private-interest factor—where the claim arose—does not support transfer or weigh against it.  In APA cases, "courts generally focus on where the decisionmaking process occurred to determine where the claims arose."  *Home Builders*, 675 F. Supp. 2d at 179 (citations omitted).  Where the decision-making process was concentrated in a particular city or state, courts have found this factor to weigh heavily in the transfer analysis.  *See, e.g.*, *Preservation Soc'y*, 893 F. Supp. 2d 49 at 56 (finding that the third-factor supports transfer where all decision-making occurred in Charleston, South Carolina, "the Complaint alleges no involvement by Corps staff based in Washington . . . . [and] the potential effects Plaintiffs have alleged will all be felt in Charleston, not in Washington"); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 502 F. Supp. 2d 64, 67-68 (D.D.C. 2007) (denying transfer where the "national rulemaking process DOI engaged in when formulating the regulation [at issue] took place in the district, and public discussions of the proposed regulation took place here").  On the other hand, where the decision-making process was diffuse courts have found this factor to be neutral.  *See Wilderness Soc'y*, 104 F. Supp. 2d at 15 (finding the third private-interest factor "inconclusive" where research was conducted and documents were drafted in Alaska, the Record of Decision and some policy review occurred in the District of Columbia, and "the entire rulemaking process had a national dimension as comments were received from all 50 states and public meetings were held both inside and outside of Alaska");

*see also Defenders of Wildlife v. Salazar*, No. 12-1833, slip op. at 6 (D.D.C. Apr. 11, 2013) (finding the third private-interest factor "essentially neutral" where the final rule "was promulgated by FWS from Washington, D.C., [but] significant decision making also took place in Wyoming").

Though the District of Columbia's ties to the decision-making process are significant, *see supra* Part IV.B.1., those ties are but a part of the nationwide, federal and state decision-making mechanism that resulted in the Project's selection and approval. Defendant Agencies were joined as Trustees by 13 state agencies, including two from Alabama; the Alabama Trustees oversaw the initial screening process that resulted in the selection of the Project, which was one of several hundred that they reviewed; representatives of each of the Affected States, along with four representatives of Defendant Agencies based outside the District of Columbia, served on the Trustee Council's Executive Committee; the preparation of the EIS was overseen by FWS's office in Atlanta, Georgia; 14 of the 15 public meetings regarding Phase III early restoration projects were held outside of this forum; the Alabama state legislature passed a bill authorizing the Project; representatives of each state agency signed the Stipulation; representatives of each Affected State signed the ROD; and two representatives of the Federal Agencies based outside the District of Columbia signed both the ROD and the Stipulation.

In opposing transfer, Plaintiffs have emphasized that "Defendants point to no relevant federal decisions made in Alabama, let alone in the Southern District of Alabama, that would indicate that the Southern District of Alabama was the source of Gulf Restoration Network's claims." Pl.'s Opp'n at 13; *id.* at 2 ("Defendants point to no federal official in Alabama, and no official of any stripe in the Southern District of Alabama, who played a role in approving the use of public funds for the Convention Center Project."); *see also id.* at 10 ("It is more telling that Defendants have identified no such person residing in the Southern District of Alabama, or indeed

16

anywhere in the State of Alabama."); Hr'g Tr. at 29:2-3 ("There wasn't a decision-making process in the Southern District of Alabama . . . ."). Plaintiff's argument unfairly discounts the role that Alabama-based actors, particularly Alabama state officials, played in the Project's selection and approval process. The Alabama Trustees selected the Project, recommended it to the Executive Committee, and presumably voted for its approval; public meetings were held in Alabama; and an Alabama-state trustee was designated as responsible for the Project's implementation. Thus, the transferee district was not, as Plaintiff claims, completely divorced from the decision-making process. *See generally*, *e.g.*, *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70 (D.D.C. 2013) (discussing connections to the state of Alabama in denying transfer to the Southern District of Alabama).

### 4. *Remaining private-interest factors*

The remaining private-interest factors do not weigh for or against transfer. As to the fourth private-interest factor, the District of Columbia is not more or less convenient to either of the parties. Plaintiff is based in New Orleans, Louisiana, which is geographically closer to the proposed transferee district than to the District of Columbia. Defendants correctly assert, and Plaintiff does not contest, "that the Southern District of Alabama would be no less convenient for New Orleans-based GRN than the District of Columbia." Mot. at 10. With regard to Defendants, the District of Columbia obviously is not an inconvenient forum. But nor is the Southern District of Alabama, where they have asked to litigate this matter.

The final two private-interest factors—the convenience of the witnesses and the ease of access to sources of proof—are also neutral with respect to transfer. APA cases are likely to be decided on the basis of the administrative record, without discovery or witness testimony. *See* 5 U.S.C. § 706 (in reviewing an agency action "the court shall review the whole record"); *see also*

*Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("In applying [the Section 706(2)] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). As this is an APA case in which the administrative record is "all digital," Hr'g Tr. 24:17, the final two factors do not bear on this court's decision regarding transfer.

### C. Public-Interest Factors

The first two public-interest factors—the transferee court's familiarity with the governing law and the relative congestion of the courts' dockets—are neutral with regard to transfer. The third and final public-interest factor—the local interest in deciding local controversies at home—however, weighs heavily in the court's assessment.

As to the first public-interest factor—the transferee court's familiarity with the governing law—the Court sees no need to deviate from "the principle that the transferee federal court is competent to decide federal issues correctly . . . ." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987) (citations omitted) (internal quotation marks omitted). Neither party questions the Southern District of Alabama's competence to adjudicate the claims at issue. Because both this court and the transferee court are competent to interpret OPA, NEPA, and the APA "there is no reason to transfer or not transfer based on this factor." *See Nat'l Wildlife Fed'n*, 437 F. Supp. 2d at 49.

The second public-interest factor—the relative congestion of this court and the Southern District of Alabama—similarly offers no reason to transfer or not transfer this case. Absent a showing that the docket of either court is "substantially more congested" than the other, this factor

is neutral.  *Home Builders*, 675 F. Supp. at 178.  Statistics show and the parties agree that the congestion of the two dockets is comparable.[11]  *See* Pl.'s Opp'n at 16.

The third public-interest factor—the local interest in having local controversies decided at home—presents a substantial reason for transfer.  "In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).  The D.C. Circuit has recognized that "in complex suits . . . [venue] policies must protect not only the interests of the technical defendants . . . but, more importantly, those whose rights and interests are in fact most vitally affected by the suit . . . ."  *Adams v. Bell*, 711 F.2d 161, 167 n. 34 (D.C. Cir. 1983).  A trial held "in the locality of the policies or transactions at issue" respects those localized interests and "serves to further public participation in and the accountability of a judicial process that will result in decisions directly and vitally affecting large numbers of citizens."  *Id.*  The importance of respecting localized interests is equally applicable "to the judicial review of an administrative decision which will be limited to the administrative record."  *Trout Unlimited*, 944 F. Supp. at 19 (citation omitted).

Plaintiff argues that the Spill and the related restoration efforts are of "national significance," Pl.'s Opp'n at 16, that there is a "profound national interest" in how Defendants fulfill their obligations pursuant to OPA and NEPA, *id.* at 18, and that the judgment in this case could affect "the conduct of the broader Deepwater Horizon Natural Resource Damage

---

[11] Though Plaintiff does not contest the similarity of the two relevant district court dockets, it argues that the "marked contrast between the relative docket congestion" of the U.S. Court of Appeals for the Eleventh Circuit, which has jurisdiction over appeals from the Southern District of Alabama, and the U.S. Court of Appeals for the District of Columbia, which has jurisdiction over appeals from this court, weighs in opposition to transfer.  *See* Pl.'s Opp'n at 16 n. 3.  In analyzing the relative congestion of transferor and transferee court's dockets, courts in this district focus on the dockets of the district courts that may hear the case.  *See, e.g.*, *Trout Unlimited*, 944 F. Supp. at 19 (analyzing the relative docket congestion of this district and the Northern District of Colorado).  The court finds no reason to deviate from the well-settled framework of analysis here.

Assessment and future natural resource damage assessments in any part of the nation," *id.* at 19. Defendants acknowledge that the Spill and the subsequent restoration efforts are "issues of interest to the entire Gulf region and the Nation as a whole," Mot. at 11, but argue that the Project is located entirely in Alabama, is "aimed at compensating for the lost recreational use of natural resources exclusively in Alabama," *id.* at 11, and that the outcome of the case "will likely be felt most directly and acutely in Alabama," Defs' Reply at 8-9.

The court agrees with Defendants that this case should be litigated within the "view and reach" of the people who will be "most vitally affected" by its outcome. Although the Spill and subsequent restoration efforts are significant to individuals and communities nationwide, particularly those who reside in the other Affected States, Alabama's superior interest in this controversy is undeniable. The judgment in this case will bear directly on whether or not the Project will be constructed using funds provided under OPA. It may well determine whether or not the Project will be constructed at all.[12] A decision regarding the development of Alabama-owned and controlled land directly and "necessarily implicates considerable local economic, political, and environmental interests." *Shawnee Tribe*, 298 F. Supp. 2d at 26 (finding "the most persuasive factor favoring transfer of this litigation to Kansas [to be] the local interest in deciding a sizeable local controversy at home," and transferring the case to the District of Kansas); *cf. Home Builders*, 675 F. Supp. 2d at 178 (denying transfer where "[t]here is no indication . . . that the designation of the relevant reaches of the Santa Cruz River as traditional navigable waters will have a major impact on local economic, political and environmental interests"). For that reason, it is not surprising that Alabama officials and citizens were integrally involved in the selection and approval of the Project. *See supra* Part IV.B.3.; *see also Trout Unlimited*, 944 F. Supp. at 19-20

---

[12] The Amended Complaint notes that, thus far, six Alabama governors have tried and failed to complete the Project, which has now been approved. *See* Am. Compl. ¶ 48.

(characterizing the controversy at issue as "localized" in part due to the decision-making that occurred in Colorado, and transferring the case to the District of Colorado).   Though the involvement of federal and state officials outside of Alabama illustrates the enormity of the Spill's impact, that fact does not eclipse the substantial interest of Alabama's citizens in having litigation about a development project on state-owned land, whose impact will primarily be felt by Alabamans, decided in a local forum.

The instant case is distinguishable from the cases cited by Plaintiff in support of its argument that the controversy at issue is not localized.   In both *Oceana* and *Wilderness Society*, the plaintiffs challenged decisions that affected the use of *national* resources managed by *federal* officials.   962 F. Supp. 2d at 77 (denying transfer where the challenged decision "re-opened a vital national resource reserve held by the Federal Government for the public") (citation omitted) (internal quotation marks omitted); 104 F. Supp. 2d at 13 ("[T]he land at issue has consistently been treated as a national resource despite the special interest of the Alaskan people.   For instance, when Congress transferred management of the [National Petroleum Reserve planning area in Alaska] to the Secretary of the Interior in 1976, it was to ensure that the reserve would be regulated in a manner consistent with the total energy needs of the Nation.") (citation omitted) (internal quotation marks omitted).   Further differentiating *Oceana* is the fact that the national resource at issue in that case was located "on the outer continental shelf, beyond the bounds of any state."   962 F. Supp. 2d at 77.   And the subject of the decision at issue in *Defenders of Wildlife*, another case relied upon by Plaintiff, was similarly not located in a single state.   No. 12-1833, slip op. at 10 (stating that the challenged decision "impact[ed] a wolf population that spans the entire northern Rocky Mountains, encompassing not only Wyoming but also Montana, Idaho, and parts of Washington, Oregon, and Utah").

21

The facts in *Otay Mesa Property L.P. v. U.S. Dep't of Interior* and *Stand Up* are also distinguishable from those of the instant case, because in neither case was there an interested "local population," like the people of Alabama.  In *Otay Mesa*, the litigation regarded "private property that is not accessible by the public" and therefore "directly affect[ed] only the [p]laintiffs."  584 F. Supp. 2d 122, 128 (D.D.C. 2008).  The court explicitly distinguished the facts of its case from that of cases, such as this one, where, "the local population faced specific injury of a particularly local nature either as a result of, or upon enjoinment of, a challenged action."  *Id.* at 127.  In *Stand Up*, the local population directly affected by the disputed decision was expressly *not* interested in having the case decided in its home forum.  There, the affected community—the North Folk Rancheria of Mono Indians—intervened, and opposed transfer.  *See* 919 F. Supp. 2d at 65.

## V.   CONCLUSION

In summary, the question whether to transfer is a close one.  The Plaintiff's choice of forum is entitled only to some deference because the District of Columbia is not its home forum.  Defendants' choice of forum is afforded some countervailing weight.  The remaining private- and public-interest factors, save one, are neutral.  What then tips the balance in favor of transfer is the substantial local interest in deciding local controversies at home.  Defendants' motion to transfer this case to the Southern District of Alabama is therefore granted.  A separate Order accompanies this Memorandum Opinion.