# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| GULF RESTORATION NETWORK, )<br>     Plaintiff, )<br>          )<br> v.         )<br>          )<br>SALLY JEWELL, Secretary of )<br>the Interior, UNITED STATES )<br>DEPARTMENT OF THE INTERIOR, )<br>DR. KATHRYN SULLIVAN, )<br>Undersecretary of Commerce for )<br>Oceans and Atmosphere and NOAA )<br>Administrator, NATIONAL OCEANIC )<br>AND ATMOSPHERIC )<br>ADMINISTRATION, GINA MCCARTHY, )<br>Administrator of the Environmental )<br>Protection Agency, ENVIRONMENTAL )<br>PROTECTION AGENCY, TOM )<br>VILSACK, Secretary of Agriculture, )<br>U.S. DEPARTMENT OF AGRICULTURE, )<br>and, )<br>          )<br>N. GUNTER GUY, JR., in his )<br>official capacity as the Commissioner of the )<br>Alabama Department of Conservation & )<br>Natural Resources, )<br>    Defendants. )<br>_____) | Case No.: 1:15-cv-0191-CB-C |

## <u>SECOND AMENDED COMPLAINT</u>
## <u>FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE .......................................................................................... 5

PARTIES .............................................................................................................................. 6

LEGAL FRAMEWORK .................................................................................................... 8

    I.    THE NATIONAL ENVIRONMENTAL POLICY ACT ................................ 8

    II.    THE OIL POLLUTION ACT OF 1990 ....................................................... 10

THE DECISION TO USE NATURAL RESOURCE RESTORATION FUNDS FOR A
CONVENTION CENTER .................................................................................................. 12

    I.    DEEPWATER HORIZON OIL SPILL & THE EARLY RESTORATION
    PROCESS ................................................................................................... 12

    II.    THE PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT ON PHASE
    III EARLY RESTORATION PROJECTS ............................................. 14

    III.    THE ALABAMA CONVENTION CENTER PROJECT AND ITS LACK OF VALID
    OIL POLLUTION ACT AND NATIONAL ENVIRONMENTAL POLICY ACT
    ANALYSIS ................................................................................................. 17

        A.    The Convention Center Described in the Programmatic Environmental Impact
        Statement as a "Restoration Project" Has No Cost Estimate, No Financing, and No
        Actual Plans ........................................................................................ 20

        B.    The Programmatic Environmental Impact Statement Does Not Provide Any
        Evidence that the Alabama Convention Center Project Will Compensate for Lost
        Recreational Use ................................................................................. 22

        C.    The Programmatic Environmental Impact Statement Does Not Provide Any
        Information on How Restoration Offsets were Calculated ............................. 24

        D.    The Programmatic Environmental Impact Statement Contains No Discussion of
        Specific Alternatives to the Alabama Convention Center Project. .................. 25

        E.    The Programmatic Environmental Impact Statement Fails to Consider All the
        Connected, Cumulative and Other Impacts of the Alabama Convention Center Project. 26

FIRST CAUSE OF ACTION ........................................................................................... 28

    (Violations of the National Environmental Policy Act and the Oil Pollution Act: Failure to
    Consider Project-Level Alternatives)

SECOND CAUSE OF ACTION ...................................................................................... 30

    (Violation of the National Environmental Policy Act:  Failure to Provide Data to Justify the
    Need for, or the Benefits Anticipated from, the Alabama Convention Center Project)

THIRD CAUSE OF ACTION ........................................................................................... 31

(Violation of the National Environmental Policy Act: Failure to Take a "Hard Look" at Cumulative and Connected Actions)

FOURTH CAUSE OF ACTION ................................................................................................ 33

(Prospective Injunction against Defendant N. Gunter Guy)

PRAYER FOR RELIEF ........................................................................................................... 35

## INTRODUCTION

1.        On April 20, 2010, the drilling rig Deepwater Horizon, operated by British

Petroleum ("BP"), exploded and sank.  For the next 87 days, the broken drill pipe spewed oil into

the waters of the Gulf of Mexico.  Oil smothered deepwater ecosystems and washed in waves

onto the shores of Louisiana, Mississippi, Alabama, and Florida (the "Spill").  The Spill and its

cleanup have caused environmental damage on a scale and of a complexity never before

witnessed in the history of American oil production.  The Gulf Restoration Network's

members—citizens and organizations from across the Gulf of Mexico states—were profoundly

affected by the Spill and its aftermath.

2.        The federal Oil Pollution Act, 33 U.S.C. § 2701, *et seq*., provides a very specific

mechanism for forcing a responsible party like BP to pay for the damages to publicly owned

natural resources caused by an oil spill.  This process—called the "Natural Resource Damage

Assessment" process—is intended to require a careful assessment of the actual damage from the

oil spill and to ensure that the party responsible for the spill pays to repair or replace the damage

to public resources.  In the Spill's wake, federal and state officials convened the Deepwater

Horizon Natural Resource Damage Assessment ("DWH Natural Resource Damage

Assessment").

3.        The Natural Resource Damage Assessment is an extraordinarily valuable

process, which seeks to return to the public the public trust resources taken from it by an oil spill.

Federal and state agencies are appointed to undertake this process, and the gravity of their role in

ensuring that funds are properly expended on behalf of the public is demonstrated by the fact that

these agencies are specifically denominated as "trustees."  In the common law, trustees are

1

charged to act solely for the benefit of the beneficiaries of the trust, in this case, the citizens of the United States and the five Gulf of Mexico states.

4.      In this complaint, the federal agencies appointed as trustees for the DWH Natural Resource Damage Assessment are referred to as the "Federal Trustees."  They are the United States Department of the Interior, Environmental Protection Agency, Department of Commerce, and Department of Agriculture.  The Alabama state agencies appointed as trustees for the DWH Natural Resource Damage Assessment are referred to as the "Alabama Trustees." They are the Alabama Department of Conservation and Natural Resources, and the Geological Survey of Alabama.  The complete set of DWH Natural Resource Damage Assessment trustees, which includes both the Federal Trustees and the state agencies appointed as trustees by each Gulf of Mexico state, are referred to collectively as the "Federal & State Trustees."

5.      For all its value, the natural resource damage assessment process only works if the designated trustees carry out their fiduciary duty to ensure that natural resource damages are repaired or replaced.  If funds from the responsible party are used for other purposes, such as subsidizing desired but unrelated infrastructure projects, the loss to the public from the oil spill is never recouped.

6.      This case is in this Court because the State of Alabama pressed the Federal Trustees for the DWH Natural Resource Damage Assessment to use $58.5 million of the limited funds meant to restore the Gulf Coast's natural resources to subsidize a convention center and hotel in an Alabama state park (the "Alabama Convention Center Project" or the "Project"). Alabama had tried without success for over a decade to promote this project as a means of economic development.  The actual cost of the project and source of the other funds which

would be necessary to construct it are unknown.  The Federal Trustees nonetheless acquiesced to

the demand that the Project receive natural resource damage funding.

       7.      The Oil Pollution Act and the regulations implementing it specifically define

"restoration" as actions to "restore, rehabilitate, replace, or acquire the equivalent of injured

natural resources or services."  15 C.F.R. § 990.30.  The Federal Trustees adopted Alabama's

claim, which is not supported by any data in the documents, that a hotel and convention center

would "replace lost recreational use along the Alabama coast" by increasing "access" to Gulf

State Park and the surrounding area.  Phase III ERP/PEIS Ch. 11, p. 59.  Building a hotel and

convention center is plainly not an action that will "restore, rehabilitate, replace, or acquire the

equivalent of injured natural resources or services," and the Federal Trustees do not even try to

explain how building a convention center qualifies as a "restoration project."  As described

further below, the Federal Trustees offer no more than their assurances that the $58.5 million in

spending will remediate harm caused by the Spill to the use of coastal natural resources.

Moreover, much of the plan for the Alabama Convention Center Project remains conjectural, and

the configuration, cost, financing and other aspects of the Project are entirely unknown.

       8.      The Federal Trustees also made the decision to commit limited restoration

funding to the Alabama Convention Center Project without complying with one of the most basic

and common-sense of our environmental protection statutes, the National Environmental Policy

Act.  This statute requires that federal entities like the Federal Trustees fully assess the

environmental impacts of their actions, and consider reasonable alternatives.  In this case there

were many other site-specific alternatives, such as preserving, creating and improving habitat,

which would directly address damage caused by the oil spill.  However, the Federal Trustees

refused even to address these alternatives or their actual restoration benefits as compared to the Alabama Convention Center Project.

9.      As a consequence of the Federal Trustees' failure to provide information supporting their decision, and failure to consider readily available and very reasonable alternatives, the public has been deprived of the opportunity to make a reasoned choice among restoration projects.

10.      The decision of the Federal Trustees to allow $58.5 million in public trust Natural Resource Damage Assessment funds to subsidize building a convention center and hotel must be reversed and remanded for compliance with the basic protections of the National Environmental Policy Act and the Oil Pollution Act, including a full analysis of site-specific alternatives to the Alabama Convention Center Project.

11.      After approving the Project, the Federal & State Trustees named the Alabama Department of Conservation and Natural Resources, led by its Commissioner, Defendant N. Gunter Guy, as the "implementing trustee" for the Alabama Convention Center Project. Alabama officials have made it clear that they intend to continue expending Natural Resource Damage Assessment funds on the Convention Center project regardless of the outcome of this lawsuit.  The court must issue an injunction preventing Commissioner Guy from proceeding further with the Alabama Convention Center Project until the Federal Trustees have complied with their obligations under the National Environmental Policy Act and Oil Pollution Act. Building the Alabama Convention Center Project prior to the full review mandated by federal law would render toothless any judgment against the Federal Trustees: the Federal Trustees would be left to assess the merits of, and alternatives to, an inevitable convention center.

## JURISDICTION AND VENUE

12.     This court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, the Administrative Procedure Act, 5 U.S.C. §§ 701–06, and Oil Pollution Act, 33 U.S.C. § 2717(b).

13.     This court's subject matter jurisdiction further extends to ordering prospective injunctive relief against N. Gunter Guy, Commissioner of the Alabama Department of Conservation and Natural Resources, under the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908). *See Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 & n.1 (11th Cir. 2012). As alleged more fully below, the Alabama Convention Center Project was proposed by Alabama officials. The Alabama Trustees, including the Alabama Department of Conservation and Natural Resources, collaborated with the Federal Trustees in crafting the Project proposal and participated in the Federal Trustees' violations of the National Environmental Policy Act and the Oil Pollution Act in approving the Project. The Alabama Department of Conservation and Natural Resources is the designated "implementing trustee" for the Project. Alabama has also created a Gulf State Park Project Committee to approve proposals to design and construct the Alabama Convention Center Project, and the Committee includes Commissioner Guy or his designee as a member. Because the Alabama Department of Conservation and Natural Resources, through Commissioner Guy, exercises ongoing control over the design and implementation of the Alabama Convention Center Project contrary to federal law, declaratory and injunctive action against Commissioner Guy is necessary to secure relief.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e) because Gulf State Park, the proposed site of the Alabama Convention Center Project that is the subject of this

action, is in Baldwin County within the Southern District of Alabama.  *See* Mem. Op. 11, ECF
No. 21.  Venue is proper as to claims under the Oil Pollution Act, in addition, because
Alabama's Gulf of Mexico coastline, which lies entirely within the Southern District of
Alabama, suffered damage from the Spill.  *See* 33 U.S.C. § 2717(b).

## PARTIES

15.     Plaintiff GULF RESTORATION NETWORK is a non-profit membership
corporation incorporated under the laws of the State of Louisiana.  The Gulf Restoration
Network maintains offices in New Orleans, Louisiana, Madison, Mississippi, and St. Petersburg,
Florida.  Its mission is to unite and empower people in protecting and restoring the Gulf region's
natural resources.  It has members throughout the states bordering the Gulf of Mexico and
nationwide.

16.     The Gulf Restoration Network has numerous members who live, work, and take
advantage of the tremendous outdoor recreation opportunities in and around Gulf State Park and
otherwise in the vicinity of the Alabama Convention Center Project.  The Alabama Convention
Center Project, both when completed and during its construction, will harm their enjoyment of
the local environment in myriad ways.  The Alabama Convention Center Project will reduce
Gulf Restoration Network members' access to the precious few wild beachfront areas that
remain along Alabama's eastern Gulf Coast, adversely affect traffic patterns in a fashion that will
increase congestion along the Coast, and threaten local wildlife, such as the endangered Alabama
Beach Mouse and endangered and threatened sea turtles.  In addition, because the Alabama
Convention Center Project would reduce the Natural Resource Damage Assessment funding
available for actual restoration of the real impacts of the Spill, the Alabama Convention Center
Project will hinder natural-resource recovery and accordingly directly impact the Gulf

Restoration Network's members by diverting monies that otherwise would be devoted to true recovery efforts.  The harms to the Gulf Restoration Network's members will be directly caused by the decisions of the Defendants in this matter, and will be redressed by a decision from this Court requiring compliance with the law.

17.     Defendant SALLY JEWELL is sued in her official capacity as Secretary of Defendant the UNITED STATES DEPARTMENT OF THE INTERIOR.  The U.S. Department of the Interior, through its subsidiary bureaus and agencies, is a Federal Trustee for the DWH Natural Resource Damage Assessment, and is required to comply with all applicable laws and regulations.

18.     Defendant DR. KATHRYN SULLIVAN is sued in her official capacity as Undersecretary of Commerce for Oceans and Atmosphere and Administrator of Defendant the NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA").  NOAA is a Federal Trustee for the DWH Natural Resource Damage Assessment, and is required to comply with all applicable laws and regulations.

19.     Defendant GINA MCCARTHY is sued in her official capacity as Administrator of Defendant the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"). EPA is a Federal Trustee for the DWH Natural Resource Damage Assessment, and is required to comply with all applicable laws and regulations.

20.      Defendant TOM VILSACK is sued in his official capacity as Secretary of Defendant the UNITED STATES DEPARTMENT OF AGRICULTURE ("USDA").  USDA is a Federal Trustee for the DWH Natural Resource Damage Assessment, and is required to comply with all applicable laws and regulations.

21.     Defendant N. GUNTER GUY, JR. is sued in his official capacity as the Commissioner of the Alabama Department of Conservation and Natural Resources.  The Alabama Department of Conservation and Natural Resources is an Alabama Trustee for the DWH Natural Resource Damage Assessment.   Commissioner Guy executed the Project Stipulation approving the Alabama Convention Center Project.  In the Project Stipulation, the Alabama Department of Conservation and Natural Resources was appointed as the "implementing trustee" for the Alabama Convention Center Project.  Commissioner Guy, or his designee, is also a member of the Gulf State Park Project Committee.  *See* ALA. CODE § 9-14E-5(d).   The Gulf State Park Project Committee was created by state law to implement the Alabama Convention Center Project and comprises high-level Alabama officials.  *See id.* Commissioner Guy, in his official capacity, is required to comply with all applicable laws and regulations.

## LEGAL FRAMEWORK

I.     **THE NATIONAL ENVIRONMENTAL POLICY ACT**

22.     Congress enacted the National Environmental Policy Act to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  The law implements the precautionary principle of "think first, then act."

23.     To fulfill this goal, the statute and its implementing regulations require federal agencies to prepare a document called an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

24.      An environmental impact statement must "provide full and fair discussion of significant environmental impacts" associated with a federal decision and "inform

8

decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  The document must include a discussion of the direct, indirect, and cumulative impacts for each reasonable alternative, 40 C.F.R. § 1508.25(c), and must identify "any adverse environmental effects which cannot be avoided should the proposal be implemented."  42 U.S.C. § 4332(2)(C)(ii).

25.    An environmental impact statement must "be supported by evidence that the agency has made the necessary environmental analyses."  40 C.F.R. § 1502.1.  Agencies must "identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."  40 C.F.R. § 1502.24.

26.    The discussion of alternatives to the proposed action "is the heart of the environmental impact statement," and it must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14; *see* 42 U.S.C. § 4332(2)(C)(iii), (E).  Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14.

27.    The Council on Environmental Quality's National Environmental Policy Act regulations also outline a process called "tiering."  *See* 40 C.F.R. §§ 1502.20, 1508.28.  In the tiering process, an agency may prepare a broad Environmental Impact Statement assessing the general impacts of a program or planning process.  *See id.*  This is frequently called a "programmatic environmental impact statement."  When later, site-specific actions are taken under the program, the agency can then "tier" to the earlier, more general statement for a broader discussion, but undertake the detailed analysis of the site-specific action in a focused

environmental impact statement or environmental assessment.  *See id.*  Critically, however, the

"tiering" process does not relieve the agency of the fundamental obligation to consider

reasonable alternatives to the site-specific action at some point prior to its final decision.  In this

case, the Federal Trustees prepared a Programmatic Environmental Impact Statement, but did not

perform the site-specific analysis necessary under the National Environmental Policy Act for the

Alabama Convention Center Project.

## II.      THE OIL POLLUTION ACT OF 1990

28.      Congress enacted the Oil Pollution Act in 1990, seventeen months following the

Exxon Valdez oil spill in Alaska.  *Gen. Elec. Co. v. U.S. Dep't of Commerce*, 128 F.3d 767, 770

(D.C. Cir. 1997).  The law provides a comprehensive framework for assessing the liability of

responsible parties for natural resource damage to waterways and coastal areas caused by oil

spills.  *Id.*  The Oil Pollution Act's ultimate aim "is to make the environment and public whole

for injuries to natural resources and services resulting from an incident involving a discharge or

substantial threat of a discharge of oil," by "return of the injured natural resources and services to

baseline and compensation for interim losses of such natural resources and services from the date

of the incident until recovery."  15 C.F.R. § 990.10; *see also id.* § 990.54(a)(2).  "Baseline" is

"the condition of the natural resources and services that would have existed had the incident not

occurred."  15 C.F.R. § 990.30.

29.      The Oil Pollution Act provides that "each responsible party for a vessel or a

facility from which oil is discharged . . . is liable for the removal costs and damages . . . that

result from such incident."  33 U.S.C. § 2702(a).  "Damages," include "injury to, destruction of,

loss of, or loss of use of, natural resources, including the reasonable costs of assessing the

damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee."  33 U.S.C. § 2702(b)(2)(A).

30.     The law permits only designated trustees, representatives of federal, state, local, or tribal governments, to recover natural resource damages.  33 U.S.C. § 2706(a)–(b).  Federal trustees are appointed by the President of the United States, and the Governor of each affected state may appoint state or local officials to serve as state trustees.  33 U.S.C. § 2706(b).

31.     The law gives trustees the responsibility to conduct a Natural Resource Damage Assessment and "develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship."  33 U.S.C. § 2706(c); *see* 15 C.F.R. §§ 990.10, 990.50–990.56.  The objective of the Natural Resource Damage Assessment process is to "determine the restoration actions needed to bring injured natural resources and services back to baseline and make the environment and public whole for interim losses."  15 C.F.R. § 990.30.

32.     Trustees are required to consider and select recovery projects from "a reasonable range of restoration alternatives."  15 C.F.R. § 990.53(a)(2).  A restoration project alternative "must be designed so that, as a package of one or more actions, the alternative would make the environment and public whole."  *Id.*

33.     The Oil Pollution Act's implementing regulations specifically define "restoration" as actions to "restore, rehabilitate, replace, or acquire the equivalent of injured natural resources and services."  15 C.F.R. § 990.30.

## THE DECISION TO USE NATURAL RESOURCE RESTORATION FUNDS FOR A CONVENTION CENTER

### I.  DEEPWATER HORIZON OIL SPILL & THE EARLY RESTORATION PROCESS

34.    The Deepwater Horizon was an oil-drilling rig leased and operated by BP Exploration & Production, Inc.  In the spring of 2010, the Deepwater Horizon was engaged in drilling a well in the Macondo prospect in the Gulf of Mexico, about 40 miles southeast of Louisiana's coastline.

35.    On April 20, 2010, a series of human and mechanical failures culminated in an explosion that tore through the Deepwater Horizon.  *See generally In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).  The explosion caused oil to gush from the seabed, nearly 5,000 feet below the surface, for months, until the well finally was capped in mid-July 2010.  The result was the largest oil spill in the history of the United States and a clean-up and containment effort that at its height enlisted 50,000 workers on land and sea.

36.    Over the 87 days in which the well remained uncapped, millions of barrels of oil and as-yet unquantified amounts of natural gas flowed freely into the Gulf.  In an effort to break apart large concentrations of oil, responders released 1 million gallons of toxic dispersants into Gulf waters.

37.     As the Federal & State Trustees describe:

> [T]he Spill caused impacts to coastal and oceanic ecosystems ranging from the deep ocean floor, through the oceanic water column, to the highly productive coastal habitats of the northern Gulf, including estuaries, shorelines and coastal marshes.  Affected resources include ecologically, recreationally, and commercially important species and their habitats in the Gulf and along the coastal areas of Texas, Louisiana, Mississippi, Alabama, and Florida.  These fish and wildlife species and their supporting habitats provide a number of important ecological and recreational use services.

U.S. Dep't of Interior, *et al.*, Deepwater Horizon Oil Spill Natural Resource Damage

Assessment: Programmatic and Phase III Early Restoration Plan and Early Restoration

Programmatic Environmental Impact Statement Ch. 1, p. 1 (June 2014) [hereinafter "Phase III

ERP/PEIS"].

38.    In the Spill's aftermath, BP was named a responsible party for the Spill under

the Oil Pollution Act.

39.    The United States designated the United States Department of the Interior,

Environmental Protection Agency, Department of Commerce, and Department of Agriculture as

the Federal Trustees, appointed to act as fiduciaries for the people of the United States in the

DWH Natural Resource Damage Assessment.

40.    To undertake the DWH Natural Resource Damage Assessment, the Federal

Trustees are joined by trustees selected by each of the five Gulf Coast states.  Alabama named

the Alabama Department of Conservation and Natural Resources and the Geological Survey of

Alabama as its Alabama Trustees.

41.    The Federal & State Trustees are currently engaged in assembling the DWH

Natural Resource Damage Assessment by assessing the totality of the injuries to Gulf natural

resources caused by the Spill.

42.    While the DWH Natural Resource Damage Assessment process is ongoing, the

Federal & State Trustees and BP elected to approve some restoration projects to begin to address

injuries caused by the Spill.

43.    In April 2011, the Federal & State Trustees and BP executed a document called

the Framework for Early Restoration Addressing Injuries Resulting from the Deepwater Horizon

Oil Spill (the "Framework Agreement").   The purpose of this document was to govern approval

and implementation of restoration projects prior to the release of a final DWH Natural Resource Damage Assessment.  BP agreed to provide $1 billion in funding for early restoration projects.

44.     The Framework Agreement is not a statute or regulation.  It was adopted without formal public notice and comment, and without input from the public.  A version of the agreement is now publicly available.[1]  It outlines that any early restoration projects approved by the Federal & State Trustees would offset BP's ultimate liability for natural resource damages from the Spill under DWH Natural Resource Damage Assessment, generating "NRD Offsets." However, the Framework Agreement does not specify the exact method by which the Federal & State Trustees and BP would establish the NRD Offset for each project.  It states only that the appropriate offset will be calculated on a project-by-project basis.

45.     The Framework Agreement also provides that for any early restoration project implemented by or at the direction of one of the Federal & State Trustees, and not BP, BP will receive the agreed-upon NRD Offsets regardless of whether the project actually realizes the estimated benefits in remediating natural resource damage from the Spill.

46.     Pursuant to the Framework Agreement, after the completion of required public and environmental review, the Federal & State Trustees and BP will memorialize their agreement on, and the specific terms of, each project in a Project Stipulation.  The agreement of the Federal Trustees and a Project Stipulation are therefore conditions precedent to any funding flowing to the state of Alabama for the Alabama Convention Center Project.

## II.     THE PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT ON PHASE III EARLY RESTORATION PROJECTS

47.     The Federal & State Trustees decided to approve and to fund early restoration projects in several phases.  In 2012, in Phases I and II of Early Restoration Planning, the Federal

---

[1] Framework Agreement, http://www.gulfspillrestoration.noaa.gov/wp-content/uploads/2011/05/framework-for-early-restoration-04212011.pdf  (last accessed Oct. 15, 2014).

14

& State Trustees and BP approved a total of $71 million in funding for 10 projects.  The Phase I

and II projects address marsh, oyster habitat, and dune restoration, improvements to avian and

sea turtle breeding areas, and construction of recreational boat ramps.  *See* Phase III ERP/PEIS

Ch. 2, pp. 6–8.  In June 2013, the Federal & State Trustees published a Notice of Intent to

Prepare a Programmatic Environmental Impact Statement and Early Restoration Plan for Phase

III early restoration projects.  The $58.5 million subsidy for a convention center that is in dispute

here was included in the Phase III projects and deemed a "restoration project."

   48. On December 6, 2013, the Federal & State Trustees released a draft Phase III

Early Restoration Plan and Programmatic Environmental Impact Statement (the "Programmatic

Environmental Impact Statement").  The U.S. Department of the Interior served as the lead

agency preparing the Programmatic Environmental Impact Statement.  Phase III ERP/PEIS Ch.

1, p. 4.  The final Programmatic Environmental Impact Statement was released on June 26, 2014.

79 Fed. Reg. 36,328 (June 26, 2014).

   49. Although the Federal & State Trustees described the Phase III document as a

programmatic environmental impact statement, they also contend that the document acts as a

site-specific environmental impact statement for the Alabama Convention Center Project and the

44 different projects proposed by the various Federal & State Trustees.  *See* Record of Decision

for the Phase III ERP/PEIS at 2–3, 5 (Oct. 2014) [hereinafter "ROD"].  The 44 projects include

valuable ecosystem restoration measures, such as improving barrier islands, dunes, living

shorelines, oyster habitat, and seagrasses.  Phase III ERP/PEIS Ch. 7, pp. 1, 21–33.

   50. Chapters 5–6 of the Programmatic Environmental Impact Statement document

the Federal & State Trustees' programmatic environmental review, in which the Federal & State

Trustees evaluated four groupings of alternative project categories for early restoration: (1) no

action on early restoration at this time; (2) restoration of habitats and living coastal marine resources; (3) providing and enhancing recreational opportunities; and (4) a combination of habitat and living marine resource restoration and improving recreational opportunities.  After comparing these categories, the Federal & State Trustees chose to fund both projects that benefit recovery of natural habitats and coastal and marine natural resources, as well as those that—at least purportedly—enhance recreational use of Gulf Coast resources.

51.    In a section on severability, the Federal & State Trustees clarified that each of "the proposed Phase III projects presented in this Final [Programmatic Environmental Impact Statement] are independent of each other and may be selected independently by the [Federal & State Trustees].  A decision not to select one or more of the proposed projects in the Final [Programmatic Environmental Impact Statement] should not affect either the programmatic elements of the plan or the [Federal & State Trustees'] selection of the remaining Phase III Early Restoration projects."  Phase III ERP/PEIS Ch.1, p. 10; *see also* Phase III ERP/PEIS Ch. 5, p. 6; ROD at 28.  As the Federal & State Trustees noted, a number of the projects proposed for Louisiana and Mississippi have already undergone stand-alone National Environmental Policy Act review, and the Programmatic Environmental Impact Statement adopted those analyses. Phase III ERP/PEIS Ch. 7, pp. 33–34.

52.    Plaintiff Gulf Restoration Network has actively participated in the public comment period for the Programmatic Environmental Impact Statement.  Gulf Restoration Network, like many other members of the public and public-interest groups, provided extensive comments to the Federal & State Trustees outlining concerns with both the draft and final versions of the Programmatic Environmental Impact Statement.  It submitted a final comment letter on the Final Programmatic Environmental Impact Statement on July 24, 2014.  Gulf

16

Restoration Network and other commenters have repeatedly raised all of the legal and factual

issues presented in this complaint in their comments to the Federal Trustees.


III.    **THE ALABAMA CONVENTION CENTER PROJECT AND ITS LACK OF
        VALID OIL POLLUTION ACT AND NATIONAL ENVIRONMENTAL POLICY
        ACT ANALYSIS**



Image: Dunes at Gulf State Park. From Gulf State Park, Gulf Shores AL, *Gulf Coast
Visitor Guide*, http://www.gulfcoastnewstoday.com/gulf_visitor_guide/play/golf
/article_cb068532-81f7-11e2-84b0-001a4bcf887a.html (last accessed Oct. 20, 2014).

53.    Since long prior to the Spill, Alabama has wanted to build a new convention

center and hotel in Gulf State Park.  As Alabama's Lieutenant Governor explained to a local

news source, Governor Robert Bentley "is the sixth Alabama governor to try and complete the

project" which would "'be a crown jewel for the Gulf Coast without costing taxpayers a dime.'"

George Talbot, *Gov. Robert Bentley Signs Bill Creating a "Crown Jewel" Conference Center in

Gulf Shores*, AL.COM, May 14, 2013,

http://blog.al.com/wire/2013/05/gov_robert_bentley_signs_bill_2.html (last accessed Oct. 20,

17

2014).   The Alabama Convention Center Project consumes by far the largest share of Phase III early restoration project funds directed to the state.  Phase III ERP/PEIS Ch. 11, p. 55.

54.      Alabama could have chosen to fund the project entirely with private funds.  It could have authorized subsidies for the project from general revenues or from a portion of the billions of dollars in other damages from the Spill that the State is likely owed by BP.  It could also have allocated the funding which the state received and will receive for direct economic development to the convention center.  Instead, Alabama chose to pay a share of the costs of the convention center using DWH Natural Resource Damage Assessment funds, which are supposed to compensate for lost natural resources.

55.      On May 2, 2013, the Alabama legislature gave final passage to SB 231, a bill that authorizes the Alabama Convention Center Project.  S.B. 231, 2013 Leg., Reg. Sess. (Ala. 2013) (codified at ALA. CODE §§ 9-14E-1–10).  SB 231 specifies: "Other than project revenues, only National Resource Damage Assessment funds or Restore Act funds may be expended to implement this chapter."  ALA. CODE § 9-14E-9.

56.      SB 231 establishes a Gulf State Park Project Committee to approve project agreements related to the development of the Alabama Convention Center Project.  ALA. CODE § 9-14E-5(d).  The Gulf State Park Project Committee includes the Commissioner of the Alabama Department of Conservation and Natural Resources, Defendant N. Gunter Guy, or his designee. *See id.*

57.      SB 231 provides that the act "is contingent on the submission to and approval of a current market feasibility study by the Gulf State Park Project Committee."  *Id.* § 9-14E-3.  No market feasibility study was completed prior to the approval of the Alabama Convention Center Project by the Federal & State Trustees.

18

58.     The Alabama Convention Center Project would take place entirely within Gulf State Park.  Gulf State Park is a 6,150-acre Alabama state park, comprising ecologically significant white-sand beaches and coastal wetlands on Alabama's Gulf Coast.  Gulf State Park's 2 miles of beaches border the turquoise waters of the Gulf of Mexico.  From 2007 to 2009, Gulf State Park averaged 2.5 million visitor days per year.  Phase III ERP/PEIS Ch. 11, p. 173.

59.     Gulf State Park is situated between the highly developed, beach-tourism destinations of Gulf Shores and Orange Beach, Alabama.  Phase III ERP/PEIS Ch. 11, pp. 62, 161–62.  The Gulf Shores and Orange Beach coastlines are lined with hundreds of condominiums and hotels, as well as a large number of single- and multi-family dwellings and restaurants and retail outlets near the beach.  Phase III ERP/PEIS Ch. 11, pp. 161–62.

60.     Large portions of Gulf State Park have been developed for recreational activities. Among other features, the park presently includes a recreational beach and beach pavilion, a quarter-mile-long fishing pier, a championship, 18-hole golf course, tennis courts, a 5,000 square-foot swimming pool, recreational trails, a visitor and nature center, and an amphitheater. It also features an array of lodging options, including over 30 cabins and cottages, some with satellite television, and 496 modern campsites with electric and sewage hookups and bathhouses. *See* Phase III ERP/PEIS Ch. 11, pp. 160–61, 164, 173–74.

61.     At the same time, Gulf State Park also contains some of the few remaining wild landscapes and preserved habitat for coastal wildlife along Alabama's entire eastern coastline. *See* Phase III ERP/PEIS Ch. 11, pp. 161–62.   Gulf State Park is one of the last remaining habitats for the endangered Alabama Beach Mouse, a species that makes its home in coastal scrub and sand dunes.  Phase III ERP/PEIS Ch. 11, pp. 118–22.  Alabama Beach Mice were believed to have been extirpated from Gulf State Park by 2010, when the United States Fish and

Wildlife Service re-introduced them to the park.  Phase III ERP/PEIS Ch. 11, pp. 120–21.  Gulf

State Park also provides critical nesting habitat for loggerhead sea turtles, listed as a threatened

species under the Endangered Species Act, and is home to a variety of animal and plant life.  *See*

Phase III ERP/PEIS Ch. 11, pp. 112–13, 122–25.

    **A.  The Convention Center Described in the Programmatic Environmental Impact Statement as a "Restoration Project" Has No Cost Estimate, No Financing, and No Actual Plans**

      62.    The Programmatic Environmental Impact Statement states that the Alabama

Convention Center Project would be located on a 22-acre site that presently contains the ruins of

an old lodge that was destroyed by Hurricane Ivan in 2004, long prior to the 2010 Spill.  Phase

III ERP/PEIS Ch. 3, p. 41, Ch. 11, pp. 55, 78, 164.  The site is in a 100-year "coastal flood area

with velocity hazard."  Phase III ERP/PEIS Ch. 11, p. 98.

      63.    It is unknown exactly what the Alabama Convention Center Project will look

like, how much it will actually cost, how it will be financed, or who will operate and manage the

facility.  In the Programmatic Environmental Impact Statement, it is included as the largest

component of a "Gulf State Park Enhancement Project," which would also include funding for

an interpretive and educational center and for improving recreational trails and sand dunes in the

Park.  According to the Programmatic Environmental Impact Statement, the Alabama

Convention Center Project ultimately may be an "overnight stay and meeting facility," with 350

guest rooms and a conference center capable of accommodating about 1,500 people.  Phase III

ERP/PEIS Ch. 11, pp. 55, 67.

      64.    Although the Programmatic Environmental Impact Statement discusses the

Alabama Convention Center Project as something that is fully planned and ready for execution,

in fact, the State of Alabama did not even know if the project made economic sense at the time of

the Programmatic Environmental Impact Statement.  In late 2013, the State issued a request for proposals seeking a "Market Feasibility Study and a Construction and Operational Cost Estimate to be used to determine the market feasibility of the construction and operation of lodging and meeting space in Gulf State Park."  State of Ala. Dep't of Conservation & Natural Res., *Request for Qualifications to Prepare a Market Feasibility Study for a Project at Gulf State Park*, http://www.bc.state.al.us/PDFs/2013_RFPs/Lodging_Feasibility.pdf (last accessed Oct. 20, 2014).  The request for proposals had a deadline date of December 30, 2013, more than three weeks following the Federal & State Trustees' release of the Draft Programmatic Environmental Impact Statement.  *See id.*  That "feasibility study" is now being carried out and apparently will determine whether the market can, in fact, support a convention center.  In addition, only after release of the Programmatic Environmental Impact Statement did the State issue a request for proposals to actually design the hotel, convention center and other components of the project. *See* Univ. of Ala. Sys. et al., *Request for Proposals: Gulf State Park Lodge & Meeting Space*, Sept. 17, 2014, http://gulfstateparkproject.ua.edu/wp-content/uploads/2014/09/Lodge-RFP.pdf (last accessed Oct. 20, 2014).  Alabama publicly and candidly concedes that moving forward with the project will require "consideration of cost efficient solutions to complicated issues such as transportation and environmental restoration," in a new master planning process for Gulf State Park.  Univ. of Ala Sys., *About the Gulf State Park Project*, http://gulfstateparkproject.ua.edu/#about (last accessed Oct. 20, 2014).

65.     The $58.5 million in restoration money is described as a "portion of the funding for this project."  Phase III ERP/PEIS Ch. 11, p. 55.  The decision documents provide no estimate for the overall cost of the project, or the source of other funding.  As a result, much of the Project remains hypothetical and unknown, from its design to its total cost and financing.

Given that Alabama's master planning, market feasibility, and design processes are only in their initial stages, it is not at all clear that Alabama itself is aware of the ultimate outcome of the Alabama Convention Center Project.

**B. The Programmatic Environmental Impact Statement Does Not Provide Any Evidence that the Alabama Convention Center Project Will Compensate for Lost Recreational Use**

66.      The Programmatic Environmental Impact Statement nowhere defines conference activities or beachfront hotel lodging as a recreational use of natural resources that was harmed because of the Spill.  *See* Phase III ERP/PEIS Ch. 3, pp. 44–46.  Rather, the Federal & State Trustees measured and focused on the injuries the Spill caused to direct human uses of natural resources of the Gulf Coast, like beachgoing, swimming, boating, and fishing.  *See* Phase III ERP/PEIS Ch. 4, pp. 10–11, Ch. 11, pp. 56–57.

67.      The sole justification for calling the Alabama Convention Center Project a "restoration project" is the claim that it will make up for lost recreational use of natural resources, evidently by allowing more people access to the beach.  The Federal & State Trustees contend that the Alabama Convention Center Project would create "primarily new [recreational visits] rather than visits by those who previously would have stayed somewhere else in the area." Phase III ERP/PEIS Ch. 11, p. 57–58.   The Programmatic Environmental Impact Statement states, without citation to any technical analysis or authority other than the apparent claims of the local tourism board, that the overall Alabama Convention Center Project will result in "approximately 120,000 new visitor-nights per year at the lodge," with "a roughly comparable number of visitor-days at the park."  Phase III ERP/PEIS Ch. 11, p. 144; *see also id.* at p. 176.  In fact, the Programmatic Environmental Impact Statement apparently assumes that *every single*

*visitor* to the convention center and hotel will be a "new visitor" who otherwise would not come to the area.

68.     The only factual underpinning for the claim that the project will draw 120,000 new visitors each year to the beach is the statement that, in the area surrounding Gulf State Park, "most current overnight visitation requires longer-term, 5 to 7 night rentals of condominiums and vacation homes," and the proposed convention center and hotel would provide short-term lodging options.  Phase III ERP/PEIS Ch. 11, p. 58.  However, the Federal & State Trustees again provided no supporting data for the conclusion that there is insufficient short-term lodging in the area.  Nor does the Programmatic Environmental Impact Statement refer to any constraint on the development of short-term lodging or conference facilities outside of Gulf State Park.  In fact, this statement is factually incorrect.

69.     In response to the Gulf Restoration Network's comments raising this issue, the Federal & State Trustees simply stated that "data gathered by the Alabama Trustees relating to this issue indicates that most current overnight visitation requires longer-term, 5-7 night rentals of condominiums and vacation homes."  ROD at 8.  The claimed "data" is never identified and to date has never been made available to the public.

70.     It is worth special note that the Programmatic Environmental Impact Statement nowhere provides even a bare assertion of the need for, let alone evidence to support, the inclusion of a convention center as part of a "restoration project."  It does not discuss what convention activity the proposed facilities will likely generate or what loss of use caused by the Spill a 1,500-person convention center would offset.  It does not discuss how much it will cost to stay at the convention center hotel, or who would be expected to stay at such a facility.  In fact,

the Programmatic Environmental Impact Statement provides no detail whatsoever about the convention center other than its capacity.

**C. The Programmatic Environmental Impact Statement Does Not Provide Any Information on How Restoration Offsets were Calculated**

71.      The Programmatic Environmental Impact Statement explains that NRD Offsets for projects that promote recreational use of natural resources—the category in which the Federal & State Trustees place the Alabama Convention Center Project—can be calculated by multiplying the cost of the early restoration project by a "benefit-to-cost ratio" for that project of either 1.5 or 2.0, as selected by the Federal & State Trustees and BP without public involvement. *See* Phase III ERP/PEIS Ch. 7, pp. 9–10.

72.      The Federal & State Trustees and BP agreed to assign the Gulf State Park Enhancement Project with a benefit-to-cost ratio of 2.0, the highest possible.  Phase III ERP/PEIS Ch. 7, pp. 9–10, 60.  This means that funding the project would provide BP with NRD Offsets from its ultimate Natural Resource Damage Assessment liability totaling $171 million, $117 million of which is attributable to the convention center and hotel subsidies.  Phase III ERP/PEIS Ch. 11, p. 60.  According to the terms of the Framework Agreement, as described above, BP would be entitled to this NRD Offset regardless of whether the project actually contributes to the recovery of Gulf Coast natural resource services.

73.      The Federal & State Trustees declined to explain how this NRD Offset was reached.  In response to comments, they stated that "[t]he materials concerning Offsets exchanged with BP are settlement confidential and subject to Pre-Trial Orders in the Deepwater Horizon litigation."  ROD at 7.  It is therefore impossible for the public or the Court to know how this project compares to other projects in terms of its "bang for the buck."

74.     This leaves the public in the dark about why BP is getting credit for $117,000,000 in natural resource damages for a convention center which has no price tag, no financing, no plans, and no data to support how it would even make up for lost recreational use.

**D. The Programmatic Environmental Impact Statement Contains No Discussion of Specific Alternatives to the Alabama Convention Center Project.**

75.     The Programmatic Environmental Impact Statement does not discuss *any* project-specific alternatives to the Alabama Convention Center Project, not even one.  It merely briefly mentions and dismisses a no-action alternative and states that Alabama officials considered other, more traditional project types "that have been used historically to compensate for recreational use losses in natural resource damage restoration plans."  Phase III ERP/PEIS Ch. 11, pp. 57, 84.

76.     In their Record of Decision, the Federal & State Trustees stated that Alabama officials "made available a more complete alternatives analysis . . . prior to finalizing the analysis presented in both the draft and Final Phase III [Programmatic Environmental Impact Statement]."  ROD at 6.  No such alternatives analysis appears anywhere in the record as part of the Programmatic Environmental Impact Statement or the Record of Decision.  The Federal & State Trustees also argue that "the Framework Agreement and the need to negotiate projects with BP for funding constrains the range of project-level alternatives that can be considered formally in the [Programmatic Environmental Impact Statement]."  ROD at 6.  Thus, the Federal Trustees evidently either contend that they could not perform the alternatives analysis required by the National Environmental Policy Act and the Oil Pollution Act, or that the State of Alabama performed that analysis in some other document which is not identified or incorporated in the Programmatic Environmental Impact Statement.

77.     There certainly are plenty of alternatives to the Alabama Convention Center Project that could have been considered.  The Programmatic Environmental Impact Statement reports that "[t]he Alabama Trustees received several hundred suggestions for Early Restoration projects."  Phase III ERP/PEIS Ch. 11, p. 55.  Moreover, in response to public comments, the Federal & State Trustees asserted that they had "evaluated a range of project alternatives, both in the overall selection of the Gulf State Park Enhancement Project for inclusion in [the Preferred Alternative] and in the selection of the project elements within the Gulf State Park Enhancement Project itself."  Phase III ERP/PEIS Ch. 13, p. 68; *see also id.* at p. 74.  However, the public does not know what these are since they are not included in the Programmatic Environmental Impact Statement.

**E.  The Programmatic Environmental Impact Statement Fails to Consider All the Connected, Cumulative and Other Impacts of the Alabama Convention Center Project**

78.     The Programmatic Environmental Impact Statement concluded its National Environmental Policy Act review of the Alabama Convention Center Project by stating "that while minor adverse impacts to some resource categories may occur, no major adverse impacts are anticipated to result."  Phase III ERP/PEIS Ch. 11, p. 179.  It also determined that while visits to the new facilities might lead to "moderate adverse impacts . . . for traffic and transportation," they would be mitigated by measures incorporated into the project design.  Phase III ERP/PEIS Ch. 11, p. 179.

79.     While the Programmatic Environmental Impact Statement assumes without supporting data that the Alabama Convention Center Project will bring in 120,000 entirely new visitors annually to the Alabama Gulf Coast, the document does not consider all of the connected and cumulative impacts which would inevitably result from these visitors and the construction of

26

a large convention center and hotel.  Gulf Shores Mayor Robert Craft, for one, expressed support for the Convention Center Project in part because it would force the state to build a new north-south road through Gulf State Park to accommodate the likely increase in traffic.  *See* Marc D. Anderson, *New Beach Roads, Trolley, Hospital, Education Campus, Ocean Futures all Take Shape in Gulf Shores Vision 2025 Plan*, AL.COM, May 7, 2014, http://blog.al.com/live/2014/05/new_beach_roads_trolley_hospit.html (last accessed Oct. 20, 2014).  Mayor Craft, in a presentation discussing Gulf Shores' strategic development plan, stated that he believed that "'one of the first things the Marriott or H[yatt] or any flag that you're going to hire to manage a world-class convention center is going to be concerned about is how you get there.'"  *Id.*  Such a road would split the park in half, introduce increased, higher speed traffic to the area, pose environmental harms, and alter the character of the park.  The Programmatic Environmental Impact Statement does not discuss this possibility of significant new road construction.

80.     Despite the Federal & State Trustees' assertion of limited traffic impacts in the Programmatic Environmental Impact Statement, the State of Alabama now makes clear that the Convention Center Project is part of an overall plan for the park and that to "allow for consideration of cost efficient solutions to complicated issues such as transportation and environmental restoration, it is necessary to begin the process by defining a master plan for Gulf State Park.  A master plan will provide a roadmap for a team of experts that will work collaboratively to create a renewed Gulf State Park."  Univ. of Ala. Sys., *About the Gulf State Park Project*, http://gulfstateparkproject.ua.edu/#about (last accessed Oct. 20, 2014).  The Programmatic Environmental Impact Statement does not—and indeed at this early stage, could not—evaluate these as-yet unsettled, "complicated issues."

81.     In spite of legal flaws and public opposition to the Alabama Convention Center Project, on October 2, 2014, the Federal Trustees approved the Gulf State Park Enhancement Project in a Record of Decision and subsequently executed a Project Stipulation for the project. In the Project Stipulation, the Federal & State Trustees appointed the Alabama Department of Conservation and Natural Resources as the "implementing trustee" for the Project.

82.     Alabama intends to advance the Alabama Convention Center Project without waiting for this court's review.  *See* Ex. A to Second Am. Compl., Letter from Gulf State Park Project Committee to Mr. Joel E. Dillard, March 4, 2015.

## <u>FIRST CAUSE OF ACTION</u>
**(Violations of the National Environmental Policy Act and the Oil Pollution Act: Failure to Consider Project-Level Alternatives)**

83.     Plaintiff Gulf Restoration Network incorporates herein by reference paragraphs 1–82, above.

84.     Under the National Environmental Policy Act, agencies must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14; *see* 42 U.S.C. § 4332(2)(C)(iii), (E).  Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).  The agency must consider at least three categories of alternatives: "(1) No action alternative.  (2) Other reasonable courses of actions.  (3) Mitigation measures (not in the proposed action)."  40 C.F.R. § 1508.25(b).

85.     Similarly, under the Oil Pollution Act, the Federal Trustees were obligated to consider and select recovery projects from "a reasonable range of restoration alternatives."  15 C.F.R. § 990.53(a)(2).

86.     The Programmatic Environmental Impact Statement entirely fails to conduct, or to tier to, analysis compliant with the National Environmental Policy Act and the Oil Pollution Act that considers project alternatives to the Alabama Convention Center Project.  It merely includes a short dismissal of a no-action alternative and references consideration of other project types undertaken by the Alabama Trustees.

87.     The fact that the Programmatic Environmental Impact Statement contains a *programmatic-level* alternatives discussion does not fulfill the requirements under the National Environmental Policy Act and the Oil Pollution Act to consider reasonable alternatives to commitment of resources at the *project level*.

88.     At a minimum, the Programmatic Environmental Impact Statement should have compared the overall Gulf State Park Enhancement Project against other types of recreational-use restoration projects for Alabama's coast.  It also should have compared the proposal against a similar alternative that did not include the Alabama Convention Center Project.

89.     Instead, as it was written, the Programmatic Environmental Impact Statement offered no basis to compare the costs and benefits of the Alabama Convention Center Project against other possible early restoration projects the Federal Trustees could have selected.  As a result, the document left no possibility for the choice of a project other than the Federal Trustees' preferred choice to fund the Alabama Convention Center Project.

90.     The Federal Trustees' failure to properly analyze restoration alternatives violates the National Environmental Policy Act and the Oil Pollution Act and renders the decision to supply early restoration funding to the Alabama Convention Center Project unlawful and arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act.  5 U.S.C. § 706.

91.     These actions and failures to act on the part of the Defendant Federal Trustees have harmed the Plaintiff Gulf Restoration Network and left it without any adequate remedy at law.

<u>**SECOND CAUSE OF ACTION**</u>
**(Violation of the National Environmental Policy Act:  Failure to Provide Data to Justify the Need for, or the Benefits Anticipated from, the Alabama Convention Center Project)**

92.     Plaintiff Gulf Restoration Network incorporates herein by reference paragraphs 1–82, above.

93.     An environmental impact statement must "be supported by evidence that the agency has made the necessary environmental analyses."  40 C.F.R. § 1502.1.  Agencies must "identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."  40 C.F.R. § 1502.24.

94.     The Programmatic Environmental Impact Statement provides little or no data to support the principal justifications for, or anticipated benefits to result from, the Alabama Convention Center Project.

95.     The Programmatic Environmental Impact Statement does not provide any data in support of its claim that the area surrounding Gulf State Park lacks the short-term lodging facilities adequate to accommodate demand.

96.     The Programmatic Environmental Impact Statement provides no data, or even any assertion, as to the need for a conference center in Gulf State Park.

97.     The Programmatic Environmental Impact Statement does not supply any studies or analyses in support of the claim that the proposal would increase visitation to Gulf State Park by 5 to 15 percent.  It does not rely on any studies or surveys for the claim that there would be 120,000 new visitor-nights per year at the Alabama Convention Center Project's lodge.

98.     The Programmatic Environmental Impact Statement does not rely on any technical study to support its claim of benefits from the proposal to the surrounding region in the form of new employment and increased revenue for local businesses.

99.     The Federal Trustees' failure adequately to justify the need for the Alabama Convention Center Project with evidence prevents the Federal & State Trustees and the public from knowledgeably assessing costs and benefits of the proposal.

100.    The Federal Trustees' failure to support their conclusions as to the need for and benefits of the Alabama Convention Center Project violates the National Environmental Policy Act and renders the decision to supply early restoration funding to the Alabama Convention Center Project unlawful and arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act.  5 U.S.C. § 706.

101.    These actions and failures to act on the part of the Defendant Federal Trustees have harmed the Plaintiff Gulf Restoration Network and left it without any adequate remedy at law.

### THIRD CAUSE OF ACTION
**(Violation of the National Environmental Policy Act: Failure to Take a "Hard Look" at Cumulative and Connected Actions)**

102.    Plaintiff Gulf Restoration Network incorporates herein by reference paragraphs 1–82, above.

103.    The National Environmental Policy Act and its implementing regulations require federal agencies to take a "hard look" at the environmental impacts of proposed actions.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *see* 42 U.S.C. § 4332.

104.    Under the National Environmental Policy Act, federal agencies must consider the direct, indirect and cumulative environmental impacts of a project.  40 C.F.R. §§ 1508.25(c), 1508.7, 1508.8.

105.    Cumulative impacts are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

106.    The National Environmental Policy Act also requires that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."  40 C.F.R. § 1502.4(a).  The scope of "actions" in an environmental impact statement includes "[c]onnected actions, which means that they are closely related" to the project proposal, such that, among other things, they "[a]re interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1508.25(a).

107.    The Programmatic Environmental Impact Statement fails to analyze new road construction made likely by the Alabama Convention Center Project as a cumulative or connected action with the project itself.  To the extent that information regarding the "complicated issues such as transportation and environmental restoration" which attend the Convention Center Project became available after the administrative record was closed in this matter, it constitutes new circumstances or information which requires preparation of supplemental NEPA documentation.

32

108.    The Federal Trustees' failure to analyze these impacts as cumulative and connected actions violates the National Environmental Policy Act and renders the decision to supply early restoration funding to the Alabama Convention Center Project unlawful and arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act.  5 U.S.C. § 706.

109.    These actions and failures to act on the part of the Defendant Federal Trustees have harmed the Plaintiff Gulf Restoration Network and left it without any adequate remedy at law.

## FOURTH CAUSE OF ACTION
### (Prospective Injunction against Defendant N. Gunter Guy)

110.     Plaintiff Gulf Restoration Network incorporates herein by reference paragraphs 1–82, above.

111.    This court should enjoin Commissioner Guy to prevent the violations of federal law delineated in Causes of Action 1–3 from continuing irreversibly.  *See Citizens for Smart Growth*, 669 F.3d at 1210 & n.1.  The Alabama Convention Center Project is the longstanding proposal of the State of Alabama.  The Alabama Trustees were closely involved with the Federal Trustees in selecting the Project for Phase III Early Restoration funding.

112.    The Project Stipulation names the Alabama Department of Conservation and Natural Resources as the "implementing trustee" for the Project.  The Alabama legislature has established a Gulf State Park Project Committee to approve proposals to design and construct the Alabama Convention Center Project, and the Committee includes Commissioner Guy or his designee.

113.    The Alabama Convention Center Project was approved by the Federal Trustees in violation of the National Environmental Policy Act and Oil Pollution Act, without considering

any project-level alternatives to a convention center, without data supporting the Project's intended benefit to natural resource recovery, and without considering cumulative and connected actions. This court must order that the Federal Trustees complete this legally mandated review.

114.    Construction of the Alabama Convention Center Project would permanently alter the costs and benefits of, and alternatives to, the Project. A substantially completed Project would be far more difficult to alter or reject in response to environmental concerns and available alternatives than merely a proposed convention center.

115.    To secure effective relief, the court must issue an injunction that binds Commissioner Guy, as the Alabama official designated to implement the Project, and prevents construction of the Alabama Convention Center Project.

116.    Furthermore, under the All Writs Act, 28 U.S.C. § 1651(a), this court has authority to enjoin prospectively the conduct of Commissioner Guy that threatens the integrity of the court's jurisdiction over this case and its ability to award effective relief. *See* 28 U.S.C. § 1651(a); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100–02 (11th Cir. 2004).

117.    Alabama has clarified that it intends to proceed with the Alabama Convention Center Project without delay. *See* Ex. A.

118.    Absent an injunction halting Alabama officials' efforts to build the Alabama Convention Center Project, this court will be unable to award meaningful relief for the Federal Trustees' violations of federal law. Unless the court enters such an injunction, the very convention center the Federal Trustees unlawfully approved, and the object of the case and controversy at bar, would already be built in whole or in substantial part.

119.    These actions and failures to act on the part of the Defendant Commissioner Guy have harmed and will continue to harm the Plaintiff Gulf Restoration Network and have left it without any adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Gulf Restoration Network respectfully prays that this Court:

(1)    Declare that the Federal Trustees violated the National Environmental Policy Act and the Oil Pollution Act and their implementing regulations by approving the Alabama Convention Center Project;

(2)    Declare unlawful and set aside the Record of Decision, as it relates to approving the Alabama Convention Center Project;

(3)    Declare unlawful and set aside the Project Stipulation, as it relates to approving the Alabama Convention Center Project;

(4)    Order the Federal Trustees to withdraw their approval of the Alabama Convention Center Project;

(5)    Enjoin the Federal Trustees and Commissioner Guy from taking any action in furtherance of the Alabama Convention Center Project until the Federal Trustees comply with the law;

(6)    Award Plaintiff Gulf Restoration Network the costs it has incurred in pursuing this action, including attorney's fees and costs, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable statutes; and

(7)    Grant such other relief as is proper.


Dated:  May 19, 2015

Respectfully submitted,


/s/Robert B. Wiygul
Robert B. Wiygul, *pro hac vice*
Waltzer Wiygul & Garside LLC
1011 Iberville Dr.
Ocean Springs, Mississippi 39564
Telephone: (228) 872-1125
Fax: (228) 872-1128
Robert@waltzerlaw.com

Michael L. Brown, *pro hac vice*
Waltzer Wiygul & Garside LLC
1000 Behrman Highway
Gretna, Louisiana 70056
Telephone: (504) 340-6300
Fax: (504) 340-6330
Michael@waltzerlaw.com

Stephen E. Roady, *pro hac vice*
D.C. Bar No. 926477
Earthjustice
1625 Massachusetts Ave., N.W., Suite 702
Washington, D.C. 20036-2212
Telephone: (202) 667-4500
Fax: (202) 667-2356
sroady@earthjustice.org

*Attorneys for Plaintiff Gulf Restoration Network*

**Certificate of Service**

I hereby certify that on May 19, 2015, I filed the above pleading and its attachments with the Court's CM/ECF system, which will send notice to each party.

/s/ Robert B. Wiygul
Robert B. Wiygul