IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **Gulf Restoration Network**, | Case No. 1:15-cv-0191-CB-C |
| Plaintiff, | |
| v. | |
| **Sally Jewell, et al.,** | |
| and | |
| **N. Gunter Guy, Jr.**, | |
| Defendants. | |

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT

JOHN C. CRUDEN
Assistant Attorney General
Envt. & Natural Resources Div.

KRISTOFOR R. SWANSON
(Colo. Bar No. 39378)
Senior Trial Attorney
Natural Resources Section
U.S. Department of Justice

The Gulf State Park Enhancement Project is one of more than fifty early restoration projects that State and Federal Trustees have approved to restore, or compensate for the lost use of, natural resources injured by the Deepwater Horizon Spill. The Project will compensate the public, in part, for the lost use of natural resource-based recreational opportunities, drawing new visitors to Gulf State Park with restored dunes, improved trails, interpretative and education centers, and a rebuilt lodge and conference center. The Trustees intend this and the other early restoration projects to provide more-immediate compensation for natural resource injuries while the Trustees proceed with a full injury assessment.

Plaintiff Gulf Restoration Network ("GRN") clearly disagrees that the Project will compensate the public for lost use of natural resource services. But GRN's challenge on those grounds fails because the National Environmental Policy Act ("NEPA") does not require federal agencies to take any certain action or make the use and offset justifications that GRN seeks. And the Federal Trustees complied with the NEPA requirements that GRN does reference.[1] Summary judgment should be entered in favor of Defendants.[2]

---

[1] GRN has not disagreed that any duty to consider a reasonable range of alternatives to the Project under the Oil Pollution Act's implementing regulations is coextensive with NEPA's requirements. Fed. Defs.' Cross-Mot. 17–18, ECF No. 51.

[2] Even if GRN were to prevail, and despite GRN's belated request for the remedy, vacatur would not necessarily follow. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289–91 (11th Cir. 2015) (recognizing remand without vacatur). Given that the ROD here did much more than select the Gulf State Park Enhancement Project, and that the Project is much more than just the lodge and conference center, additional briefing as to remedy would be appropriate should the Court rule in GRN's favor.

1

I. **The Trustees Considered a Reasonable Range of Alternatives Under the Identified Objective of Implementing Early Restoration Pursuant to the Framework Agreement**

GRN's first claim alleges that the Federal Trustees failed to consider a reasonable range of alternatives to the Gulf State Park Enhancement Project under NEPA. Our cross-motion explained that the alternatives analysis here is necessarily limited by the Trustees' objective—or "purpose and need"—to implement early restoration as set forth in the Framework Agreement with BP. *See* Fed. Defs.' Cross-Mot. at 12–18. In response, GRN makes two arguments: (1) the purpose and need was much broader than we argued in our cross-motion (Pl.'s Reply 3–13, ECF No. 53); and (2) the Framework Agreement did not prohibit consideration of other alternatives (Pl.'s Reply at 13–17). Both arguments are fallacious.

    A.    **The Trustees Reasonably Defined the Purpose and Need**

In arguing for a broader purpose and need, GRN continues to ignore the context and reality of early restoration. Relying upon a single paragraph in the EIS, GRN asserts that the purpose and need was not to implement the Framework Agreement, but to conduct early restoration, *i.e.*, accelerate restoration of injured natural resources. *See* Pl.'s Reply at 4–5. The distinction is one without a difference. Early restoration depends entirely upon the Framework Agreement; without the Framework Agreement, there would be no funds with which the Trustees could accelerate restoration. That is so because, under the Oil Pollution Act ("OPA'), restoration of injuries to natural resources occurs using damages recovered from the party responsible for those injuries. *See* 33 U.S.C. § 2706(f); 15 C.F.R. §§ 990.60–990.66. Through the Framework Agreement, BP effectively gave an advance on

damages so that restoration activities would not have to await completion of a full injury assessment and resulting damages finding. The Trustees relied upon the Framework Agreement in noticing their intent to prepare an EIS and restoration plan (AR009634), and identified the link in the resulting document: "The Early Restoration planning process is both part of the [Natural Resource Damages Assessment] *and the product of agreement with BP*." AR015238 (emphasis added); *see* AR015246–55 (process).

Thus, GRN is wrong that the purpose and need did not include the use of funds made available through the Framework Agreement. *See* Pl.'s Reply at 5. GRN views reliance on those funds as creating a situation in which the Trustees were implementing "whatever BP would agree to." Pl.'s Reply at 4. But BP's role makes perfect sense: absent the funds BP voluntarily made available in the Framework Agreement, restoration would have had to await full restoration planning and potentially-lengthy litigation with BP over the natural resources damages assessment.[3] *See* 15 C.F.R. § 990.64. Further, the Framework Agreement does not leave decision-making on early restoration projects to BP. All the Trustees must approve an early restoration project. AR007614 (Paragraph 11).

For similar reasons, GRN misses the point in citing to cases that have found federal agencies to have defined their purpose and need too narrowly. *See* Pl.'s

---

[3] Since approval of the Gulf State Park Enhancement Project, the United States, Gulf States, and BP have reached a global settlement for all claims, including natural resource damages claims. *See* Draft Programmatic Damages Assessment, 80 Fed. Reg. 60,126, 60,128 (Oct. 5, 2015).

Reply at 5–6. The cases simply stand for the proposition that an agency's purpose and need must be reasonable under the circumstances. *See Citizens for Smart Growth v. Dep't of Transp.*, 669 F.3d 1203, 1212 (11th Cir. 2012); *Davis v. Mineta*, 302 F.3d 1104, 1119 (10th Cir. 2002). *Citizens for Smart Growth* actually upheld the purpose and need statement. *See* 669 F.3d at 1212. And *Davis* involved the question of whether a purpose and need to provide a river crossing could reasonably be read as limiting reasonable alternatives to one specific crossing location. *See* 302 F.3d at 1119. *Davis* is not analogous to the present facts.

GRN takes its citation to *Davis* further, arguing that the Framework Agreement somehow prejudged the outcome of the environmental review. *See* Pl.'s Reply at 6 (citing *Davis*, 302 F.3d at 1112–13).[4] *Davis* involved a consultant contract that included a provision to find "no significant impact," thus presupposing the outcome of the intended NEPA analysis. 302 F.3d at 1112. The Framework Agreement, by contrast, says nothing about the NEPA process or its outcome. To the contrary, the Agreement allows the Trustees to withdraw a previously-proposed project based upon public comment or environmental review. AR007614 (paragraph 12). Similarly, GRN's citation to *National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058, 1070–71 (9th Cir. 2010), is factually irrelevant. *See* Pl.'s Reply at 6 (citing for proposition that agencies cannot adopt

---

[4] *See also* Pl.'s Reply at 7–8 (citing to *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813–14 (9th Cir. 1999), for same); *id.* at 12–13 (arguing Framework Agreement cannot contract away NEPA obligations).

4

private interests to draft a narrow purpose and need). The Alabama Trustees, not BP, proposed the Gulf State Park Enhancement Project (AR008470–78), and all the Trustees approved the Project after considering the environmental review and public comment. The purpose and need statement did not elevate a BP interest above that of the Trustees, acting on behalf of the public.

### B. The Trustees Considered a Reasonable Range of Alternatives Under the Purpose and Need

With a proper understanding of the purpose and need (and recognizing the deference due the Federal Trustees in defining it, *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)), the Trustees' consideration of only the proposed Project and the no action alternative cannot be deemed arbitrary and capricious. An early restoration project cannot proceed without agreement among the Trustees and BP. AR007614 (Paragraph 11). Thus, absent that agreement, a potential project is not a "reasonable" alternative because it could not achieve the agency's intended purpose of accelerating meaningful restoration. *See N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990); AR018039–40.

GRN is wrong when implying that, as a matter of law, agencies must consider more than just the preferred action and the no action alternative. *See* Pl.'s Reply at 7. "NEPA does not impose any minimum number of alternatives that must be evaluated." *Citizens for Smart Growth*, 669 F.3d at 1212. Instead, agencies need

5

only consider "reasonable" alternatives, which only includes those that "will bring about the ends of the federal action." *Citizens Against Burlington*, 938 F.2d at 195.[5]

GRN's citation to the Council on Environmental Quality's "Forty Most Asked Questions" document is also misplaced. Pl.'s Reply at 6–7. The document is not binding. *See Hartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 433–34 (8th Cir. 2004); *Friends of the Earth v. Hintz*, 800 F.2d 822, 837–38, 837 n.15 (9th Cir. 1986). And GRN's reference to it for the proposition that agencies must consider alternatives that cannot actually be carried out is contrary to decades of case law defining "reasonable" to include considerations of feasibility and the agency's identified objectives. *See N. Buckhead Civic Ass'n*, 903 F.2d at 1541; *Citizens Against Burlington*, 938 F.2d at 195. That case law is sound—an analysis of alternatives that cannot be implemented would do nothing to meet NEPA's purposes of informing agency decision-makers and the public on the environmental

---

[5] GRN argues that "most"—notably, not "all"—of the cases we cited on page 14 of our cross-motion involved circumstances in which the agency "considered" more than just the preferred and no action alternatives. Pl.'s Reply at 9–10. But GRN misapplies the verb "consider," which is often used in NEPA parlance to describe a detailed analysis of potential impacts from the preferred action, the no action alternative, and other reasonable alternatives. *See* 40 C.F.R. § 1502.14. Where an alternative is removed from detailed study for feasibility or other concerns—though still arguably "considered" in the common sense of the word—the agency need only "briefly discuss" its reasons for doing so. *Id.* § 1502.14(a). GRN does not appear to dispute that the Trustees briefly discussed why they were not considering other alternatives in detail. *See* AR018039–40. Instead, the issue, as GRN has presented it, is whether the Trustees should have included any additional alternatives in their detailed analysis. *See, e.g.,* Pl.'s Reply at 11 n.27. Thus, GRN does not support its argument by pointing out that, in some of our cited cases, agencies "considered," but did not analyze in detail, other alternatives. *See, e.g., Citizens Against Burlington*, 938 F.2d at 197 (EIS analyzed two alternatives in detail, eliminating three others from consideration).

effects of potential federal action. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

Rather than address the correct standard, GRN attempts to prove its argument via case law analogies. *See* Pl.'s Reply at 8–9. In doing so, however, GRN inappropriately contorts the facts to fit its chosen cases. GRN analogies to *Davis* because there are many ways to meet "the purpose and need of restoring damaged natural resources and their services." Pl.'s Reply at 8. But the purpose and need here is *early* restoration as governed by the Framework Agreement, not full compensation for all injuries from the Spill.

GRN's analogy to *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 20 (D.D.C. 2000), is similarly misplaced. Pl.'s Reply at 9. In *American Oceans*, a committee presented the Secretary of Commerce with proposed amendments to essential fish habitat designations that the Secretary then had to (partially or fully) approve or disapprove. *See* 183 F. Supp. 2d at 4, 19–20. The agency's alternatives discussion considered only two options: (1) maintain the status quo (*i.e.*, a "no action" alternative in the form of disapproval); or (2) adopt the amendments. *See id.* at 20. The court rejected that range of alternatives because the statutory scheme left the Secretary with other options, including preparing a separate amendment. *See id.* With respect to the Gulf State Park Enhancement Project, however, the Trustees faced only two options: (1) include the negotiated project in Phase III of early restoration; or (2) not include the project, in which case the identified early

7

restoration funds would remain unspent and available for future restoration planning.[6] AR018039–40.

Perhaps recognizing that the range of reasonable alternatives is necessarily informed by the concept of early restoration in the Framework Agreement, GRN turns to their second argument: that the Framework Agreement allowed the Trustees to consider other potential projects as alternatives to the Gulf State Park Enhancement Project. Pl.'s Reply at 13–17. But GRN again misunderstands the Framework Agreement's role. The Agreement does not delineate or limit the Trustees' environmental review like a contract. Rather, it provides the context within which the Trustees are acting and, thus, necessarily sets the bounds of the Trustees' purpose and need. That purpose and need (not the Framework Agreement's terms) defines the reasonable range of alternatives. *See Citizens Against Burlington*, 938 F.2d at 195.

In any event, GRN makes too much of the Agreement's terms. GRN argues that Paragraph 12 allows the Trustees to take action outside of the Agreement. Pl.'s Reply at 14. The Paragraph certainly recognizes the Trustees' authority to propose and implement restoration projects that are not funded by BP, which is not surprising given that BP is only one of several parties responsible for the Spill. At

---

[6] GRN misunderstands the Trustees' articulation of the latter course as "deferring" action. *See* Pl.'s Reply at 3, 7 n.23. The verb "defer" captures an important reality: if the Trustee do not select a proposed project for early restoration, they could still consider the project as part of full restoration planning once they have completed the full injury assessment. GRN's misunderstanding is significant, as the resulting tone gives the incorrect impression that the Gulf State Park Enhancement Project is the end all, be all of restoration for injured natural resources in Alabama.

the time of Phase III early restoration, however, the Framework Agreement constituted the only commitment from a responsible party to fund restoration.

Similarly, GRN is incorrect that negotiations with BP could (or should) have occurred after environmental review had been undertaken for the Project. *See* Pl.'s Reply at 14. It would be a waste of resources to proceed with planning and environmental review for projects that BP would potentially not agree to fund and, thus, could not be implemented. The Trustees set this out in narrative and visual form in the EIS. AR015246–47. It is also not surprising that the project stipulations the Agreement envisions are entered after environmental review. *See* Pl.'s Reply at 14 (citing AR007614). The Agreement allows the Trustees to withdraw or modify a project based upon that review or public comment. AR007614 (Paragraph 12). This does not change the practical fact that an early restoration project is only feasible if BP has at least tentatively agreed to provide early restoration funds for its implementation. A proposal to take some action is a necessary precursor to an environmental review of that action. Summary judgment should be granted in favor of the Defendants on GRN's first claim for relief.

## II. Plaintiff Cannot Make a Standalone APA Challenge to the Trustees' Approval of the Gulf State Park Enhancement Project, and the Remaining Arguments Do Not Present Violations of NEPA

Like its other claims, GRN brings its second claim under the Administrative Procedure Act. Second Am. Compl. ¶¶ 92–101, ECF No. 34. In support of that claim, GRN argues that the Federal Trustees' actions were arbitrary and capricious because the Trustees failed to: (1) demonstrate that the Project will make up for lost recreational use by drawing visitors to the area; and (2) justify the restoration

9

credit given to BP for the early restoration funds dedicated to the Project. *See* Pls.' Reply at 18–25. Our cross-motion explained how neither argument demonstrates a violation of NEPA (the statute requires an assessment of environmental effects, not appropriate compensation for lost recreational use opportunities) and why OPA is no longer relevant (GRN dropped its OPA claim). Fed. Defs.' Cross-Mot. at 18–23.

In response, GRN does not dispute that it dropped its OPA claim. Instead, it modifies its argument to assert violations of "basic principles of administrative law." Pls.' Reply at 18. But the modification fairs no better than the original.

<u>First</u>, "'[t]here is no right to sue for a violation of the APA in the absence of some relevant statute whose violation 'forms the legal basis for [the] complaint.'" *Sierra Club v. Martin*, 110 F.3d 1551, 1555 (11th Cir. 1997) (alterations in original, international quotations and citations omitted); *see Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798–99 (9th Cir. 1996); *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792–93 (8th Cir. 1996). Thus, it is not enough for GRN to argue that the Trustees erred because the record allegedly does not support, or the Trustees did not adequately explain, the conclusion that the Project will attract 120,000 new visitors per year or the decision to provide a 2:1 NRD Offset ratio.

Instead, GRN "must identify a substantive statute or regulation that the agency action ha[s] transgressed." *Preferred Risk*, 86 F.3d at 792–93. This is because, under APA review,

> [w]hether an agency has overlooked "an important aspect of the problem," . . . turns on what a relevant substantive statute makes "important." * * * [W]here there is no law to apply. . . , it is legally irrelevant whether an agency has made a "finding" that is "contrary to

10

the evidence before it" or that's "so implausible that it couldn't be ascribed to a difference in view or the product of agency expertise." *Thomas*, 92 F.3d at 798 (explaining why *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), does not open the door to judicial review independent of a substantive underlying statute). GRN's renewed reference to *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274 (S.D. Ala. 1998), illustrates the point. *See* Pl.'s Reply at 23. The conclusion that the federal agency had failed to explain in *Sierra Club* arose from the Endangered Species Act's requirements. *See* 15 F. Supp. 2d at 1279–82; *id.* at 1279 ("the Court must first look to the substantive law (ESA § 10(a)(2)(B)(ii)) to ascertain what is required of the agency").

Second, GRN's effort to invoke NEPA as the relevant underlying statute fails because NEPA did not require the Trustees to consider a restoration project's level of compensation for lost recreational use or the potential NRD Offsets that would attach. As our cross-motion explained, NEPA requires federal agencies to consider the environmental effects of their proposed actions. *See* Fed. Defs.' Cross-Mot. at 18–19. GRN jumps on the word "environmental" and claims we have argued that the Gulf State Park Enhancement Project "is actually not 'environmental.'" Pl.'s Reply at 18, 20, 21. The issue, however—and the point we made in our cross-motion (*see* Fed. Defs.' Cross-Mot. at 18)—is that GRN's second claim for relief does not relate to the *environmental effects from* the Project, thus not implicating NEPA.

GRN is not arguing that the Trustees failed to consider how 120,000 additional visitors per year would affect the human environment; instead, GRN is arguing there is no support for the proposition that there will be 120,000 additional

11

visitors.7 *See* Pl.'s Reply at 1 ("record contains no actual facts to support the conclusion that the Project would restore natural resources or services.").8 From the NEPA perspective, it is legally irrelevant whether the Gulf State Park Enhancement Project will compensate for lost recreational use opportunities or how BP will be credited with NRD Offsets. "Other statutes may impose substantive environmental obligations on federal agencies;" NEPA does not. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

GRN's effort to spin their second claim for relief into the NEPA regulation addressing cost-benefit analyses does not demonstrate a NEPA violation. *See* Pl.'s Reply at 19, 25 (citing, among other things, 40 C.F.R. § 1502.23). As our cross-motion explained, NEPA requires disclosure of a cost-benefit analysis when one is undertaken as necessary to choose among different alternatives. *See* Fed. Defs.' Cross-Mot. at 22. GRN asserts that the Trustees "purportedly" undertook a cost-benefit analysis. Pl.'s Reply at 25. But GRN points to no such study (or any reference to one) in the record, citing only the Framework Agreement. *See*

---

7 The second claim for relief is distinct from the third, which asserts that the Trustees failed to consider Project effects on, among other things, traffic. *Compare* Second Am. Compl. ¶¶ 92–101 *with* ¶¶ 102–109. There is no dispute that the Trustees based their environmental review upon 120,000 additional visitors being drawn to the Park each year. Even if the record included information showing fewer than 120,000 annual visitors, however, there is nothing unreasonable about using the larger (and potentially more impactful) number to assess potential environmental effects.

8 *See also* Pl.'s Reply at 17 ("whole point of [the Project] is supposedly to make up for loss of the services"); *id.* at 20 n.51 (alleged deficiencies are in the "justification for the Project"); *id.* at 20 n.53 ("no reasoned basis [is] offered to support the conclusion that this project will do anything to make up for damaged natural resources").

AR007613 (paragraphs 8 and 9). Contrary to GRN's assertion (Pl.'s Reply at 25 & n.69), the Framework Agreement did not require the Trustees to compare the potential NRD Offsets for different projects in selecting early restoration projects, let alone to select projects that provide the lowest NRD Offset ratio to BP. *See* AR007612–13 (paragraph 6, listing project selection criteria). Thus, GRN again fails in its attempted analogy to the Fourth Circuit's *Hughes River* opinion. *See* Pl.'s Reply at 25 n.69; Fed. Defs.' Cross-Mot. at 22.

<u>Third</u>, to the extent GRN is invoking OPA as the underlying statute (Pl.'s Reply at 21, 24), the effort fails because this case contains no OPA claim other than GRN's passing reference to OPA's alternatives requirement. *See* Fed. Defs.' Cross-Mot. at 19–21. The decision to approve the Project and the question of whether the Project is a valid project under OPA are not before the Court.[9]

In any event, the Trustees' reliance on the estimated 120,000 additional visitors per year was not arbitrary and capricious. As Defendant Guy explained in his opening brief, the number is derived from a prior study of a potential conference center in Gulf State Park. *See* Def. Guy's Cross-Mot. at 20–21, ECF No. 52 (citing AR016419, AR002776–96); *see also* AR016420 (explaining basis for calculation). Despite GRN's assertion to the contrary (Reply at 22), that prior study is not stale simply because of its age, and GRN points to nothing else that would render the study unreliable. *See League of Wilderness Defenders/Blue Mtns. Biodiversity*

---

[9] GRN repeatedly portrays our cross-motion as having "conceded" that there is no factual basis for certain decisions, but never actually cites or quotes to the specific language in which we allegedly made that concession.

13

*Project v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014). Nor were the Trustees required to disclose the specifics of their negotiations with BP regarding the NRD Offsets. *See* Pl.'s Reply at 24. The Trustees' and BP's negotiations are subject to confidentiality orders in the multi-district litigation involving the Spill. *In re: Oil Spill by the Oil Rigg Deepwater Horizon in the Gulf of Mexico*, MDL No. 2179 (E.D. La.), ECF Nos. 2, 655, 2375, 3201. The EIS disclosed the early restoration funds that would be dedicated to the Project and the offsets BP would receive in return. AR015650–56; AR016338. This information allowed the public and agency decision-makers to weigh the Project in the larger scheme of injury restoration. Summary judgment should be granted in favor of Defendants on GRN's second claim.

**III.   The Trustees Took a Hard Look at Potential Environmental Effects**

Our cross-motion detailed the factual and legal errors in GRN's argument that the Trustees failed to take a hard look at potential effects from allegedly "reasonably foreseeable" road construction and new development. *See* Fed. Defs.' Cross-Mot. at 24–26. GRN's response largely just restates the points made in their opening brief, to which we already responded. *See* Fed. Defs.' Cross-Mot. at 24–26.

"To constitute a reasonably foreseeable future action, a project must be 'imminent,' 'inevitable,' or one that can be sufficiently concrete that consideration of its effects would be 'useful to a reasonable decision-maker.'" *N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 713 F. Supp. 2d. 491, 522 (M.D.N.C. 2010) (collecting cases); *see City of Oxford v. Fed. Aviation Admin.*, 428 F.3d 1346, 1353 (11th Cir. 2005) (plans must be concrete enough that information can be gathered on which to conduct an analysis). The actions that GRN alleges to be "reasonably

14

foreseeable" fall far short of that standard. There are no concrete proposals for a new intersection, a new road, or new development. Indeed, there are not even proposals at all, only speculation by GRN or the Mayor of Gulf Shores. As a matter of law and practicality, far more is required to make a connected action reasonably foreseeable such that its effects need to be, or even can be, considered in a NEPA document. *See, e.g., Airport Impact Relief v. Wykle*, 192 F.3d 197, 206–07 (1st Cir.1999) (potential airport expansion "neither imminent nor inevitable" when contingent on events that had not yet occurred); *N.C. Alliance for Transp. Reform*, 713 F. Supp. 2d at 523–24 (highway concept not reasonably foreseeable because no funding source); *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1327–28 (S.D. Fla. 2005) (potential development reasonably foreseeable where county had taken concrete steps, *e.g.*, land acquisition and rezoning). Summary judgment should be granted in favor of Defendants on GRN's third claim.

## Conclusion

Gulf Restoration Network has not shown that the Federal Trustees acted arbitrarily and capriciously or contrary to law in their approval of the Gulf State Park Enhancement Project. To the contrary, the Federal Trustees considered a reasonable range of alternatives under the identified purpose and need; were not required by the National Environmental Policy Act to justify either the Project's validity under Oil Pollution Act or the NRD Offsets that BP would receive; and took the requisite hard look at potential environmental effects from the Project. Summary judgment should be granted in favor of Defendants.

Date: December 11, 2015

                              JOHN C. CRUDEN
                              Assistant Attorney General

                              _*Kristofor R. Swanson*_
                              KRISTOFOR R. SWANSON
                              (Colo. Bar No. 39378)
                              Senior Trial Attorney
                              Natural Resources Section
                              Envt. & Natural Resources Div.
                              U.S. Department of Justice
                              P.O. Box 7611
                              Washington, DC 20044-7611
                              Tel: (202) 305-0248
                              Fax: (202) 305-0506
                              kristofor.swanson@usdoj.gov

                              *Attorney for the Federal Defendants*

### Certificate of Service

     I hereby certify that on December 11, 2015, I filed the above pleading with the Court's CMS/ECF system, which will send notice of such to each party.

                              _*s/Kristofor R. Swanson*_
                                KRISTOFOR R. SWANSON