IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| GULF RESTORATION NETWORK, § § Plaintiff, § § v. § § SALLY JEWELL, Secretary of the Interior, et al., § § Defendants. § | Case No. 1:15-cv-0191-CB-C |

## ADMINISTRATIVE RECORD APPENDIX – ADDENDUM

The administrative record appendix filed by the Federal Defendants on December 28, 2015 [Doc. 60] inadvertently omitted the following citation by Defendant N. Gunter Guy, Jr. (the Alabama Trustee):

| AR018025-AR018027 | 06/01/2014 | Programmatic and Phase III Early Restoration Plan and Draft Early Restoration Programmatic Environmental Impact Statement Part Six (Chapter 13) |
|---|---|---|

So that the Court has a complete list of the portions of the administrative record cited by the parties, the Alabama Trustee respectfully requests that this citation be added to the previously provided appendix. A copy of these pages is attached hereto as Exhibit 1.

*/s/  Jane L. Calamusa*
JANE L. CALAMUSA (CALAJ5640)
Attorney for Defendant N. Gunter Guy, Jr., in his capacity as the Commissioner of the Alabama Department of Conservation and Natural Resources

Of Counsel:
Rosen Harwood, P.A.
Post Office Box 2727 (35403)
2200 Jack Warner Parkway, Suite 200
Tuscaloosa, Alabama 35401
Telephone:     (205) 344-5000
Facsimile:      (205) 758-8358

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of January, 2016, the foregoing has been served by the court's electronic filing system, electronic mail and/or United States Mail, postage prepaid, to the following counsel of record:

>Stephen E. Roady
>EarthJustice
>1625 Massachusetts Ave., N.W., Suite 702
>Washington, D.C.  20036-2212
>
>Robert B. Wiygul
>Waltzer, Wiygul & Garside, LLC
>1011 Iberville Dr.
>Ocean Springs, Mississippi  39564
>
>Michael L. Brown
>Waltzer Wiygul & Garside, LLC
>1000 Behrman Highway
>Gretna, Louisianna  70056
>
>*Attorneys for Plaintiff Gulf Restoration Network*
>
>Kristofor R. Swanson
>Natural Resources Section
>Environment & Natural Resources Div.
>U.S. Department of Justice
>P. O. Box 7611
>Washington, D.C.  20044-7611
>
>*Attorney for Federal Defendants*

>>*/s/ Jane L. Calamusa*
>>Of Counsel

# EXHIBIT 1

outlined in the Framework Agreement that must also be satisfied to access BP funding. Collectively, the opportunities afforded the public to participate in Early Restoration planning have been substantial and extensive. The Trustees have held numerous public meetings and developed and actively manage several web-based information portals used to keep the public apprised about restoration planning for the Spill.

The Trustees understand and value the public's interest in Early Restoration, and strive to maintain a high degree of transparency while protecting the integrity of the Trustees' legal action and fulfilling the critical mission to protect, preserve, and restore the Gulf's natural resources. The Trustees have and will continue to provide ample opportunities for all members of the public to provide input into the Early Restoration planning process.

### 13.8  Offsets

35. Comment: The Trustees should be able to explain to the public and the court why BP should be given a 50% discount on human use projects where the offset is up to, and in some cases greater than, 2:1.

    Response: As with all Early Restoration project Offsets, recreational use project Offsets were developed through a combination of technical analysis and negotiations with BP. The Trustees applied a 'benefits-transfer' approach to develop, for each Phase III recreational use project, an estimated range of the benefits, in dollars, that are likely to accrue from the project. 'Benefits transfer' is a commonly utilized economic technique that applies information from existing studies to estimate values in a different context. Factors considered in the Trustees' evaluation of Phase III recreational use project Offsets included, but were not limited to: the potential number of participants expected to benefit; the potential additional value derived from new and/or enhanced recreational trips; the likely duration of benefits; the proportion of project benefits allocated to BP (if a project is only partially funded by Early Restoration funds); and a discount rate. An underlying principle of the offset calculation approach is: if lost recreational uses can be fully restored at a cost that is less than the value of the services being provided, the public is appropriately compensated by such restoration.

    Based on the benefit ranges estimated by the benefits transfer, the Trustees negotiated a benefit to cost ratio (BCR). The BCR does not represent a "discount" in favor of BP. Rather, the BCR is based on best available estimates of the project's public benefits relative to its costs. The Trustees do not agree that Offset ratios under OPA and the NRDA Regulations are limited to 1:1 in this context. The approach undertaken to estimate Early Restoration recreational use project benefits and costs, as described in the Final Phase III ERP/PEIS and briefly summarized above, provides a sufficient basis for concluding that the negotiated BCRs and associated Offsets reasonably reflect the recreational benefits likely to be gained by the public through implementation of the Phase III recreational use projects set forth in the Final Phase III ERP/PEIS.

36. Comment: Not a single project should be offset by a greater ratio than 1:1

    Response: The benefit to cost ratios for Phase III projects were arrived at through negotiations with BP taking into account the unique characteristics of the projects and the benefits of early action to restore lost resource services. The Trustees do not agree that Offset ratios for Early

Restoration projects should be limited to 1:1 (where the ratio reflects the agreed-to project benefits relative to the costs of the project).  In the restoration planning process outlined in the OPA NRDA Regulations (15 CFR §§990), Trustees are permitted to consider the value of restoration projects to the public, as well as the costs of these projects, in determining the appropriate scale of restoration. Where Spill-specific analysis identified appropriate restoration projects, the Trustees offered Offsets, consistent with those regulations and the broader NRDA objective.

37. Comment: If the restoration plan moves forward without a 1:1 value to cost, then each co-Trustee, not just the implementing Trustee, should explicitly acknowledge that they agree that the very best science and/or natural resource approach has been employed for this NRDA and will accept such an approach as the default precedent for future NRDA cases.

    Response:  All Trustees must agree to the negotiated Offsets for all Early Restoration projects. As described in the Final Phase III ERP/EIS, the methods and information used in the Trustees' evaluation of proposed Phase III project benefits are consistent with the standards for assessment procedures set forth in the OPA NRDA regulations at 15 C.F.R. 990.27, defensibly support proposed Offsets, and are appropriate for Early Restoration in the context of the Spill. The Trustees do not agree that these BCRs hold any precedent for either other parts of the comprehensive NRDA or future NRDA cases (e.g., Framework Agreement condition 9).

38. Comment: A comparison of benefits to offset credits given to BP should be provided. Each recreational use project should summarize the following economic benefits that the Trustees used to generate the benefit-to-cost ratios:

    a. The number of participants expected to benefit from each project

    b. The benefit these individuals are expected to derive from a new or enhanced experience

    c. The timeframe over which the benefits will be provided, in terms of both start date and expected duration of benefits

    Response: The information provided in the Phase III ERP/PEIS is consistent with the Framework Agreement, applicable laws, regulations and Pre-Trial Orders. The materials concerning Offsets exchanged with BP are settlement confidential and subject to Pretrial Orders in the *Deepwater Horizon* litigation.  Releasing further internal analyses not shared with BP could adversely affect ongoing or future Early Restoration negotiations or other proceedings.

39. Comment: In addition, estimated losses need to be provided so that costs, benefits and credits can be shown in relation to the lost uses. This will ensure we are receiving appropriate restoration compensation for the damage.

    Response: The NRD assessment is ongoing and estimates of total recreational losses are not yet available; however, total loss estimates are not required to support selection of the proposed Phase III recreational use projects in the Phase III ERP/EIS. The information provided in the Phase III ERP/PEIS is consistent with the Framework Agreement, applicable laws, regulations and Pre-Trial Orders.

    As a general matter, Spill-related disruptions in the public's recreational use of Gulf resources were readily observable and are well documented as widespread and extensive; Spill-related

AR018026

recreational use disruptions are discussed in Section 4.2.12 of the Phase III ERP/PEIS. Proposed Phase III recreational use projects will benefit a variety of recreational uses across a wide geographic area in the Gulf, were selected through the process described in the Phase III ERP/PEIS, and will contribute to the Early Restoration purpose of accelerating meaningful restoration of injured natural resources and their services resulting from the Spill. The Phase III ERP/PEIS is not intended to fully address all injuries caused by the Spill, which will be addressed in a comprehensive damage assessment and restoration plan. The Trustees continue to evaluate additional projects for funding as part of the Early Restoration process but also to work toward developing longer term restoration plans with the goal of fully compensating the public for all resource injuries and losses that resulted from the Spill.

## 13.9   Public Participation

40. Comment: Some members of the public feel left out of the process, information was not provided to the public in a timely manner and the Trustees should provide the public with the opportunity to get involved in the process early, and allow them to give input on project selection, project development, and the determination of offsets prior to negotiation with BP.

    Response: The Trustees have explained their approach to evaluating and selecting projects in the Early Restoration process and believe the Draft and Final Phase III ERP/PEIS provide sufficient and timely information in that regard. Responding to requests from the public, the Trustees extended the comment period in order to provide additional time for review and comment. With respect to the negotiation process, as discussed in the Draft and Final Phase III ERP/PEIS, under the Framework Agreement, each Early Restoration project is subject to negotiation with BP and agreement on project costs, BP funding and NRD Offsets. Initial negotiations were conducted with BP as a means of determining whether agreements-in-principle on the Trustees' proposed projects were achievable prior to preparing the Draft Phase III ERP/PEIS. Such initial agreements, however, are subject to the outcome of the public review of the proposed projects as presented in the Draft Phase III ERP/PEIS. For projects proposed for the Final Phase III ERP/PEIS, the negotiated agreements on costs, funding and NRD Offsets will be included in the Administrative Record in accordance with the terms of the Framework Agreement. The process and timing the Trustees have followed is consistent with the Framework Agreement, applicable law, and Pre-Trial Orders.

41. Comment: Trustees should acknowledge, address, and incorporate comments that receive "substantial attention" and should provide more opportunities for discourse on a topic if a benchmark number of comments are received on it.

    Response: The process for developing the Draft and Final Phase III ERP/PEIS included a broad effort to engage the general public and stakeholders during several key periods (for example, please see Section 1.9 "Public Review and Comment" and Section 2.1 for descriptions of the public engagement processes). Comments received during the scoping process are intended to determine the scope and significance of the issues to be evaluated in the EIS, and assist in eliminating issues that are not significant or have been covered in a prior environmental review. These comments were considered in the development of the Draft Phase III ERP/PEIS, though a formal response to scoping comments is not required.