**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| GULF RESTORATION NETWORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 15-00191-CB-C |
| | ) | |
| SALLY JEWELL, Secretary of the | ) | |
| Interior, U.S. DEPARTMENT OF | ) | |
| THE INTERIOR, DR. KATHRYN SULLIVAN, | ) | |
| Undersecretary of Commerce for the | ) | |
| Oceans and Atmosphere and NOAA | ) | |
| Administrator, NATIONAL OCEANIC | ) | |
| AND ATMOSPHERIC ADMINISTRATION, | ) | |
| GINA MCCARTHY, Administrator of the | ) | |
| Environmental Protection Agency, | ) | |
| ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, TOM VILSACK, Secretary of | ) | |
| Agriculture, U.S. DEPARTMENT OF | ) | |
| AGRICULTURE, and | ) | |
| N. GUNTER GUY, in his official capacity | ) | |
| As Commissioner of the Alabama | ) | |
| Department of Conservation & Natural | ) | |
| Resources, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION and ORDER**

This action arises from restoration efforts by federal and state agencies following

the 2010 Deepwater Horizon Oil Spill in the Gulf of Mexico.  Specifically, the Plaintiff

challenges Defendants' plan to use a portion of funds provided for early restoration of

natural resources to partially fund a proposed lodge and conference center at Alabama's

Gulf State Park.   The parties submitted the matter for resolution on cross motions for

summary judgment and came before the Court for oral argument on January 26, 2016.

(Docs. 46, 48, 51, & 52.)  After careful consideration of the administrative record, the

arguments of counsel, and the applicable law, the Court finds Plaintiff is entitled to relief on

one of the causes of action asserted in the Second Amended Complaint (SAC).

**Introduction**

On April 10, 2010, the offshore drilling rig *Deepwater Horizon* operated by British

Petroleum Exploration and Production, Inc. (BP) "exploded, caught fire and subsequently

sank in the Gulf of Mexico, resulting in an unprecedented volume of oil and other

discharges." (AR 026319-20.)  The oil spill was the largest in United States history,

releasing millions of barrels over a period of 87 days and causing damage to natural

resources in all five Gulf Coast states.  (AR 026320.) "Affected natural resources include[d]

ecologically, recreationally, and commercially important species and their nearshore and

offshore habitats in the Gulf of Mexico and along the coastal areas of Alabama, Florida,

Louisiana, Mississippi, and Texas." (*Id.*)  Pursuant to the Oil Pollution Act of 1990 (OPA),

the disaster triggered action by state and federal agencies, known as "Trustees," "to assess

natural resource injuries and losses and to determine the actions required to compensate

the public for those injuries and losses." (AR 026320.) In April 2011, the Trustees entered

an agreement with BP whereby BP agreed to make available $1 billion for early restoration

of natural resources while the full injury assessment was ongoing. This challenge arises

under the Oil Pollution Act (OPA), 33 U.S.C. §§ 2701, *et seq.*, the National Environmental

Protection Act (NEPA), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedures Act

(APA), 5 U.S.C. §§ 701-706.  The narrow issue presented by the pleadings and

administrative record in this case is whether the allocation of $58.5 million in BP early

restoration funds to partially construct a lodge and conference center was properly arrived

at applying the applicable OPA and NEPA statutes and their regulations, sufficient to

withstand the narrow "arbitrary and capricious" standard of review under the APA.

**The Parties**

Gulf Restoration Network (GRN) "is a non-profit membership corporation

incorporated under the laws of the State of Louisiana.  (SAC ¶ 15, Doc. 34.)  GRN "has

numerous members who live, work, and take advantage of the tremendous outdoor

recreation opportunities in and around Gulf State Park." (*Id.*)  The Defendants are Federal

and State Trustees designated pursuant to OPA to conduct a Natural Resources Damages

Assessment and "develop a plan for the restoration, rehabilitation, replacement or

acquisition of the equivalent, of natural resources under their trusteeship."  33 U.S.C. §

2706(c)(1)(C) & (c)(2)(C).  Sally Jewell is sued in her official capacity as Secretary of the

United States Department of Interior.  Dr. Kathryn Sullivan is sued in her official capacity as

the Undersecretary of Commerce for Oceans and Atmosphere and Administrator of

National Oceanic and Atmospheric Administration (NOAA).  Gina McCarthy is sued in her

official capacity as Administrator of the United States Environmental Protection Agency

(EPA). Tom Vilsack is sued in his official capacity as Secretary of the United States

Department of Agriculture (USDA).  Gunter Guy Jr. is sued in his official capacity as the

Commissioner of the Alabama Department of Conservation and Natural Resources.

**The Legal Framework[1]**

    **OPA**

The Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*, was enacted in response to a series of oil spills, the most notorious of which was the 1989 grounding of the tanker *Exxon Valdez* in Prince William Sound, Alaska.[2]  *United States v. Locke*, 529 U.S. 89, 96 (2000).  The OPA was designed as a "comprehensive and far-reaching approach to the problem of oil spills."  Among other things, it "sets up a federal system to clean up oil spills and compensate victims and establishes a national planning and response system to ensure effective and immediate removal of oil spill in U.S. waters."   136 Cong. Rec. H6934 (1990) (statement of Rep. Lowey).  In this regard, the statute "imposes liability (for both removal costs and damages) on parties responsible for an oil spill."  *Locke*, 529 U.S. at 101-02.  Damages are recovered by a trustee or trustees appointed, in this case, by the President and by the governors of the affected states.  *See* 33 U.S.C. § 2706(a)-(b).  The trustees are to assess damages to natural resources caused by the discharge of oil and "develop and implement a plan for the restoration, rehabilitation, replacement, or acquisition of the equivalent, of the natural resources under their trusteeship."  *Id.* § 2706 (c)(1) & (c)(2).  The process of natural resource damage assessment (NRDA) is governed by regulations

---

[1] Normally, a recitation of facts would precede a discussion of the applicable law.  In this case, however, a basic knowledge of OPA, NEPA and the APA is necessary to understand the facts.

[2] At the time, the *Exxon Valdez* was the biggest oil spill in history, releasing more than 11 million gallons of crude oil.  *Id.*  In comparison, the *Deepwater Horizon* released more than 3.19 million *barrels* of oil, *In re Oil Spill by Oil Rig "Deepwater Horizon in the Gulf of* Mexico, 77 F. Supp. 3d 500, 525 (E.D. La. 2015), which according to the Federal Trustees translates to 134 million gallons.

developed by NOAA. *Gen. Elec. Co. v. U.S. Dept. of Commerce*, 128 F.3d 767, 770-71 (Fed. Cir. 1997); 15 C.F.R. § 990.10 *et seq.*

If the trustees determine that an oil discharge caused injury to natural resources and that restoration is required, they must "identif[y] a 'reasonable range' of restoration alternatives, evaluating them against several factors, including cost, potential success, risk of collateral injury, and public health and safety." *Gen. Elec.*, 128 F.3d at 770 (citing 15 C.F.R. § 990.53-990.54.)  Next, the trustees develop a Draft Restoration Plan "setting forth the injury assessment procedures employed, the nature and extent of injuries resulting from the discharge, the restoration goals, the range of restoration alternatives considered, how the alternatives were evaluated, and which alternatives were chosen. *Id.* At 771 (citing 15 C.F.R. § 990.55(b)).  After public notice and comment, the trustees adopt a Final Restoration Plan. *Id.* (citing 15 C.F.R. § 990.55(d)).  Finally, the trustees demand payment from the responsible party or parties. *Id.* (citing 15 C.F.R. § 990.62(a)).

**NEPA**

The National Environmental Policy Act of 1969 (NEPA) "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dept. of Transportation v. Public Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).  NEPA "does not mandate particular results" but instead requires agencies to analyze the environmental impact of their proposed actions. *Id.*  To this end, NEPA imposes "action-forcing procedures" on Federal agencies. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  The "heart" of NEPA is the

Environmental Impact Statement (EIS).  *Id.*  If a proposed major Federal action would significantly affect the quality of the human environment, the official(s) responsible for the proposal must prepare an EIS that examines the adverse environmental impacts of the action, alternatives to the proposed action, "the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and "any irreversible and irretrievable commitments of resources" involved in the proposed action.  42 U.S.C. § 4332(2)(C).

Federal regulations further define the requirements an EIS must meet.  40 C.F.R. §§ 1502.1 *et seq.* Three of those requirements are relevant here.  First, "it should present the environmental impact of the proposal and the alternatives [to that proposal] in comparative form. . . providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.  Second, the EIS must be supported by evidence of the environmental analysis and must identify methodologies and scientific sources relied upon. *Id.* §§ 1502.1, 1502.24.  Third, it must consider the project's effect, both direct and indirect, as well as its cumulative impact on the environment.  *Id.* §§ § 1502.16 1508.7, 1508.8.

**APA**

The Administrative Procedures Act (APA), 5 U.S.C. §§ 701-70, permits any person adversely affected by a Federal agency's action to obtain judicial review of that action in Federal court.  *Id.* §§ 702, 703.  "The APA provides for judicial review of 'final agency action for which there is no other adequate remedy in a court.'" *Franklin v. Massachusetts,* 505 U.S. 788, 796 (1992) (quoting 5 U.S.C. § 704). Thus, when a statutory scheme (such as NEPA or OPA) provides no private right of action, an aggrieved party may seek review under the APA.  *See, e.g., Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989) (reviewing

agency's NEPA action under APA); *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63

(D.D.C. 2014) (reviewing agency's OPA action under APA).  An agency's action may be set

aside under the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C.S § 706(2)(A).  The "arbitrary and capricious" standard of

review is highly deferential.  As the Eleventh Circuit has explained:

> Along the standard of review continuum, the arbitrary and capricious
> standard gives an appellate court the least latitude in finding grounds for
> reversal; '[a]dministrative decisions should be set aside in this context … only
> for substantial procedural or substantive reasons as mandated by statute, …
> not simply because the court is unhappy with the result reached.' The agency
> must use its best judgment in balancing the substantive issues. The reviewing
> court is not authorized to substitute its judgment for that of the agency
> concerning the wisdom or prudence of the proposed action.

*North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538-39 (11th Cir. 1990).

**Facts**

### Early Restoration & the Framework Agreement

The *Deepwater Horizon's* unprecedented oil spill, beginning April 20, 2010 and

continuing 87 days until the oil well was capped, triggered OPA's natural resources damage

assessment (NRDA) provisions.  Federal Trustees and State Trustees from the five affected

states (Alabama, Florida, Louisiana, Mississippi, and Texas) began to assess injuries to

natural resources from the spill.  One year later the Trustees entered into an agreement

with BP.[3]  In this agreement, entitled "Framework for Early Restoration Addressing Injuries

Resulting from the Deepwater Horizon Oil Spill" (Framework Agreement), BP agreed to

---

[3] BP's liability under the OPA was subsequently officially determined by the United
States District Court for the Eastern District of Louisiana.  *See In re Oil Spill by Oil Rig
Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, 21 F. Supp. 3d 657, 754 n. 283
(E.D. La. 2014).

provide up to $1 billion toward early restoration projects to begin addressing injuries to natural resources resulting from the Spill.  (AR 007611-45.) In exchange, BP would get a credit against its total liability (called an "NRD offset") for each project funded under the Framework Agreement.  (AR 007613-14.)  The agreement set out the process by which projects would be funded.  First, the Trustees would select project proposals.  (AR 007613.)  Next, the proposal would be submitted to BP and the parties would negotiate the NRD offset.  (*Id.*)  Once the NRD offset was determined, the parties would enter a Project Stipulation with respect to that project.  (*Id.*)  No project could be funded under the Framework Agreement "unless all of the [p]arties agree[d]upon the project and applicable NRD Offsets for that project and execute[d] a Project Stipulation."  (*Id.*) Finally, the project would be submitted for public review and comment.  (AR 015193.)

Early restoration projects were planned to take place in three phases.  (AR 015251-53.) Phase I and Phase II, which totaled $71 million, were approved in April and December 2012, respectively.  The project at issue here is part of Phase III.

**Phase III & the Alabama Gulf State Park Project**

The Phase III plan, finalized in June 2014, is composed of 44 projects in five states. (AR 105185.)  Two types of projects were chosen for funding in this phase: (1) restoration of habitats and living coastal and marine resources and (2) recreational use opportunities. (AR 015191.)   The total cost of these projects is approximately $627 million, approximately one-third of which ($230 million) is dedicated to recreational use.  (AR 015193.)  The projects are intended to be independent of each other, so that selection of one project does not affect the viability of any other project.  (AR 015193.)

At an estimated $85.5 million the Gulf State Park Enhancement Project is the most expensive recreational use project, by far, and the second most expensive Phase III project.[4] (AR 015195-015197.)  Of the total amount dedicated to Gulf State Park, $58.5 million is to be set aside as partial funding for construction of a proposed lodge and conference center ("the lodge/conference center"), with the remainder going to build an interpretive center, a research and education center, other visitor enhancements, (such as trail improvements and signage), and dune habitat restoration.  (AR 018733-34.)  Pursuant to the Framework Agreement, BP and the Trustees entered into a Project Stipulation approving the project and agreeing to an NRD offset amount.  (AR 018715-37.)  In this instance, the agreed offset ratio is 2:1.  In other words, for every $1 spent on the Gulf State Park Enhancement Project BP is to be given $2 credit.  Thus, by setting aside $58.5 million in funding for a proposed lodge and conference center, the Trustees and BP would also remove an additional $58.5 million from early restoration funding.

At the time Phase III was approved, the Gulf State Park lodge and conference center was little more than a concept.[5]  The lodge/conference center was projected to have approximately 350 rooms and meeting space for up to 1500 attendees.  (AR 016343.) There were no architectural plans (only a sketch of what a lodge/conference center *might* look like), no specific cost estimates, and no timetable for completion. (AR 016344-45; AR 016337.)  The Trustees conceded that the $58.5 million allocated would not be sufficient to

---

[4] The only project more expensive is the Louisiana Outer Coast Restoration project, for restoration of barrier islands and beaches, at $318 million. (AR 015195.)

[5] The project was to be built on the site of the original Gulf State Park lodge and conference center, which was destroyed by Hurricane Ivan in 2004.

fund the entire project, and they did not explain where the remaining money would come from, when it would be available, when the project would be completed, or what would happen to the $58.5 million if the project did not come to fruition.  (AR 016336-37.)

**The Phase III Programmatic Environmental Impact Statement**

The Trustees prepared and submitted a Phase III Programmatic Environmental Impact Statement (PEIS) for public comment and held public meetings before adopting the final PEIS in June 2014.  (AR 015184-88.)   The PEIS is broad, covering all Phase III projects, and uses "[a] programmatic approach to assist the Trustees in evaluation of proposed projects."  (AR 015190.)  Four categories of potential programs were identified: (1) No action (i.e., no additional early restoration); (2) Restoration of habitat and living and coastal marine resources; (3) Enhanced recreational use opportunities; (4) a combination of (2) and (3).  (AR 015191.) The Trustees chose alternative (4)—a combination of restoration and recreational use.  (*Id.*)  Each of the 44 projects falls within one of these broad programmatic categories, sometimes referred to as "alternatives".  (AR 015195-015197.)  The PEIS explained the purpose and need for Phase III action as follows:  "For the purpose of accelerating meaningful restoration of injured natural resources and their services resulting from the Spill, the Trustees propose to continue implementation of Early Restoration in accordance with the Oil Pollution Act (OPA) and using funds made available in the Framework Agreement."  (AR 015239.)

The Alabama Gulf State Enhancement Project was designated a restoration project designed to make up for the loss of recreational use caused by the spill.  According to the PEIS, the lodge/conference center portion of the project would make up for lost recreational use by creating approximately 120,000 new visitor nights per year and a

roughly comparable number of visitor-days at the park.  The PEIS did not explore any

potential alternative projects; instead, it concluded that the only alternative to the project

is "No Action", i.e., "the Trustees would not pursue the Gulf State Park Enhancement Project

as part of Phase III Early Restoration."  (AR 016360.)

**Issues Presented**

In this action, GRN challenges the lodge/conference center contained within the

Alabama Gulf State Park Enhancements Project.  GRN asserts that the Trustees' actions

were arbitrary and capricious (in violation of the APA) in three respects.  First, the PEIS

failed to conduct the alternatives analysis required by both NEPA and OPA.  Specifically,

GRN argues the PEIS is deficient because it does not discuss alternatives to the

lodge/conference center other than the "no action" alternative.  This, GRN alleges, is a

violation of NEPA and OPA.  Second, GRN contends the PEIS  "provides little or no data to

support the principal justification for . . . the [lodge/conference center project]" and

therefore violates NEPA regulations requiring explanation of methodologies used and

citation to scientific data.  (SAC ¶ 93, Doc. 34) Third, GRN contends the PEIS violates NEPA

because it fails to analyze the cumulative and indirect impacts of the project. GRN seeks

declaratory and injunctive relief, including an order enjoining further action on the

lodge/conference center. [6]

Both the Federal Trustees and the State Trustee deny their actions were arbitrary

and capricious, although their arguments are not identical.  With respect to the alternatives

analysis, the State Trustee argues the program-level alternatives analysis was sufficient to

---

[6] The SAC actually asserts four causes of action, but the fourth is a claim for injunctive relief against the State Trustee under the All Writs Act, 28 U.S.C. § 1651.

meet NEPA and OPA requirements.  The Federal Trustees, on the other hand, do not rely on the program-level alternatives analysis.  Instead, they argue the project-level alternatives analysis (which discussed only the proposed project and "no action") was sufficient under the circumstances to meet the requirements of NEPA and OPA.  Both Federal and State Trustees argue GRN's second claim is not a valid NEPA claim because the alleged missing data does not relate to the environmental effects of the proposed action.  Likewise, both contend that the PEIS adequately addressed the cumulative environmental impacts of the project.

**Legal Analysis**

### First Cause of Action:  NEPA/OPA Alternatives Claim

Both NEPA and OPA require a comparative analysis of the proposed project and the alternatives to the project. 40 C.F.R. § 1502.14 (NEPA); 15 C.F.R. § 990.55(b) (OPA). Although OPA and NEPA focus on different substantive goals, the process is the same. In fact the OPA process was intended to "mirror[ ] the decisionmaking process embodied in NEPA." 61 Fed. Reg. 440, 441 (1996).  Consequently, the two claims will be analyzed as one.[7]  The alternatives analysis is "the heart of the environmental impact statement." 40 C.F.R. §1502.14.  The EIS "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. *Id.* The EIS "shall" include the following:

---

[7] The State Trustee argues the Recreational Use Alternatives document prepared by the State prior to choosing the Gulf State Park project satisfied the OPA alternatives analysis.   Because the OPA process mirrors NEPA, that document cannot be sufficient under OPA unless it is also sufficient under NEPA.

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
(c) Include reasonable alternatives not within the jurisdiction of the lead agency.
(d) Include the alternative of no action.
(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

Initially, the State Trustee argues that the *programmatic* alternatives analysis satisfies the alternatives requirement.  That analysis considered alternatives at the broader program level, not at the specific project level.  It examined the types of program alternatives that could be adopted in Phase Three Early Restoration: (1) No action (i.e., no additional early restoration); (2) Restoration of habitat and living and coastal marine resources; (3) Enhanced recreational use opportunities; (4) a combination of (2) and (3).  Of those alternative programs, the Trustees chose option (4).  Option (4) consisted of 44 different projects in five states.  When an agency proposes to commit resources to a specific project as part of a broader program, it must provide a sufficiently detailed alternatives analysis of the project.  *See Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1095-96 (9th Cir. 2006) (because Army did not consider site-specific alternatives in programmatic EIS, alternatives analysis was required in supplemental EIS); *see also New Mexico ex re. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 716-19 (10th Cir. 2009) (discussing need for site-specific alternatives analysis for oil and gas leases on federal land).  The PEIS's

examination of programmatic alternatives is not project specific and, therefore, does not satisfy the alternatives analysis requirement.

With respect to the Gulf State Park project, the PEIS discussed only two alternatives: (1) go forward with the project as proposed or (2) no action.   GRN points to several reasonable alternatives that could have been addressed:

- Purchase property for public access and conservation.

- Restore wetlands and shoreline.

- Build habitat.

- Allow private entity to fund or partially fund lodge construction and apply funds to restoration.

- Build public education and trails component and forego lodge/convention center.

The Trustees do not dispute that these are, in theory, reasonable alternatives.  They argue, however, that these alternatives are unreasonable because they could not have been implemented under the Framework Agreement.

The Trustees' circular logic goes something like this:  All funding for early restoration comes from BP via the Framework Agreement.  The Framework Agreement provides that only projects agreed to by BP and the Trustees in a Project Stipulation will be funded.  No project can go forward without funding.  Unless BP and the Trustees have agreed to a project, any other project is not a reasonable alternative because it cannot be funded. Therefore, *BP and the Trustees decide which alternatives are reasonable because only BP and the Trustees decide which projects are funded.*  Simply put, the Trustees choose a project, take it to BP, enter a Project Stipulation, and there can be no alternative other than the "no action" alternative.

14

The purpose of alternatives analysis "is to inform both the public and the decisionmaker," by giving them clearly defined alternatives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). Of course, only alternatives that are reasonable, or feasible, require discussion. *Id.* Whether an alternative is reasonable depends upon the goals of the agency's action, but "an agency may not define its goals in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goal, and the EIS would become a foreordained formality." *Id.* at 196. The Trustees point to the PEIS's "purpose and need" statement—to *accelerate* meaningful restoration—and argue that they have fulfilled their duty to consider a reasonable range of restoration alternatives. Since there could be no early restoration project absent an agreement with (and funding from) BP, no other project could achieve the stated goal. Hence, there was no "reasonable" alternative other than the "no action" alternative. This is the paradigm of a self-fulfilling prophecy. While "no minimum number of alternatives" must be considered, *Citizens for Smart Growth v. Sec'y Dept. of Transp.,* 669 F.3d 1203, 1212 (11th Cir. 2012), agencies must present a reasoned alternatives analysis.

At both the program level and the project level, the Trustees have unreasonably narrowed the universe of possible alternatives to two: (1) go forward with the project as proposed or (2) no action. In the PEIS programmatic alternatives analysis, the Trustees combined projects involving restoration of habitat and marine life with projects involving recreational use. By doing so, they created projects that could be funded under the Framework Agreement. At the project level, the Trustees contend that the only reasonable

alternative is a project that can be funded.  Since funding requires a Project Stipulation

between the Trustees and BP, only those projects are reasonable.

 Moreover, the Trustees are simply wrong in their conclusion that the Framework

Agreement/Project stipulation precludes the funding of alternative projects.  The Trustees

argue that a full alternatives analysis was not possible because there was no method for

funding any alternative project.  The Project Stipulation provides that "[a]t any time after

BP[ ] has made full payment [of Phase III funds], the Trustees may for good cause elect not

to implement the Early Restoration Project."[8]  (AR 018718.)   The Trustees may retain

unspent funds and apply them "to one or more replacement project(s), which may include

a modified version of the project . . . [and] shall be designed for lost recreational use

provided by natural resources injured in Alabama."  (AR 018719.)   This language lends

itself to no other interpretation but that there were alternatives other than those selected

projects that could have been funded.

This case demonstrates the importance of providing a clear and meaningful analysis

of alternatives.  The Trustees and BP agreed to take $58.5 million dollars ($117 million

total, with NRD offsets) out of the "pot" of funds available for early restoration with the

intention of setting those funds aside for possible use in a project that, at the time, was little

more than an idea and could not come to fruition for many years, if at all.   Clearly, the

Trustees failed to evaluate whether there were reasonable restoration alternatives that

would have conformed to the requirements of OPA and NEPA.  Their failure to do so was

arbitrary and capricious.  GRN is entitled to summary judgment on this cause of action.

_____

[8] By the terms of the agreement, funds were to be transferred to the State Trustee
within 14 days after the Project Stipulation was filed

**Second Cause of Action:  NEPA Claim/Insufficient Data**

In this cause of action, GRN alleges that the PEIS does not satisfy NEPA's requirement that "the environmental impact statement be supported by evidence that the agency has made the necessary environmental analysis," 40 C.F.R. § 1502.1, because it does not "identify any methodologies used" or "make explicit reference. . . to the scientific and other sources relied upon." 40 C.F.R. § 1502.24.  Specifically, GRN contends the record does not support the Trustees conclusion that a lodge and conference center would make up for lost recreational use by bringing new visitors to the beach.  In support of its claim, GRN points to the lack of data to support the number of visitor nights the lodge/conference center would bring or to support the need for short-term lodging in the area.  However, as the Trustees point out, these alleged deficiencies do not relate to the environmental analysis required by NEPA but to the issue of lost recreational use, a claim that can only be asserted under OPA. 40 C.F.R. § 1502.1.  Because GRN points to no deficiency in that regard, it has failed to meet its burden of proving that the Trustees acted arbitrarily and capriciously.  The Trustees are entitled to summary judgment on this cause of action.[9]

**Third Cause of Action:  NEPA Claim/Failure to Consider Cumulative Impacts & Indirect Effects**

An environmental impact statement must consider not only the direct effects of a proposed action but also cumulative impacts and indirect effects of "past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions."  *Utahns for Better Transp. v. United States Dep't of Transp.,* 305 F.3d 1152,

---

[9] The Court does not reach the Trustees' alternative argument that the data were sufficient to support conclusions regarding the need for short-term lodging.

1174 (10th Cir. 2002), *modified*, 319 F.3d 1207 (10th Cir. 2003); *see also* 40 C.F.R. § 1508.7

(defining cumulative impacts); 40 C.F.R. § 1502.16 (EIS must include discussion of indirect

effects); 40 C.F.R. 1508.8 (defining indirect effects); *see also Sierra Club v. Marsh*, 976 F.2d

763, 770 (1st Cir. 1992) (discussing direct and indirect effects requirement).  GRN asserts

the PEIS failed to consider the following indirect effects or cumulative impacts:  (1) the

reconfiguration of an intersection or widening State Road 182 at one entrance to the

proposed lodge/conference center; (2) the construction of a new road to accommodate a

likely increase in traffic; and (3) the likelihood the project will lead to new development.

None of these actions are reasonably foreseeable.

The Trustees contend the first argument, regarding road changes to accommodate

the lodge entrance, is based on a misreading of the record.  The cited paragraph from the

PEIS states:

> The proposed project would be accessed via the existing four-way, signalized
> SR 182 and 135 intersection and a reconfigured T-intersection at SR 182 and
> the old [Gulf State Park] lodge's east access.  At the second location , the re-
> established lodge would be accessed via SR 182 by a right-in and right-out
> configuration.  SR 182 would need to be widened to accommodate a left-turn
> lane from westbound SR 182, or an alternative intersection configuration
> would need to be implemented *to support increased access to the lodge*.

(AR 016432, emphasis added.)  The wording could be clearer, but what this paragraph

describes is two entrances.  The first would provide complete access in and out via a traffic

light at SR 182 and 135.  The second would provide only limited access—eastbound

vehicles could turn right into the second entrance and exiting vehicles could only turn right

onto SR 182.  If increased access were desired, i.e., to make this entrance accessible to and

from both east and west, it would be necessary to widen SR 182 or reconfigure the

intersection.   Therefore, contrary to GRN's argument, the record does not support the claim that additional roadwork would be reasonably foreseeable.

Likewise, the record does not support GRN's claim that construction of a new north-south road would likely be necessary to support the increase in traffic resulting from the proposed lodge/conference center.  The Trustees conducted a traffic study, detailed in the PEIS, and concluded the impacts of increased traffic would be moderate, with the greatest increase in travel delay being 12.1 seconds during peak periods.  (AR 016432-34.)  Based on this information, the Trustees concluded that new road construction was not reasonably foreseeable.  (AR 018412.)  The only evidence GRN cites to the contrary is a newspaper article in which the mayor of Gulf Shores expressed his support for the lodge/convention center because he believed it would force the state to build a north-south road through Gulf State Park.  The mayor's opinion does not contradict the Trustees' traffic study, nor does it provide evidence that the state would be likely to construct a new road to accommodate lodge/conference center traffic.

Finally, GRN criticizes the PEIS's conclusion that the project will not result in substantial new development.  GRN does not actually point to any evidence that substantial new development is likely to occur.  Instead, it merely points out alleged inconsistencies in the Trustees' projections.  Specifically, one justification for the project is the lack of short-term lodging, but the traffic study assumed 75% of the conference attendees would stay offsite.  The traffic study focused on peak flows and assumed the conference center was in full use.  (AR 016432.)  In other words, it was not predicting the number of visitors, only what would happen to traffic if the conference center was at maximum capacity.  GRN's only other argument is a conclusory assertion that the projected number of annual visitors

19

will "inexorably" lead to new development.  As the Trustees point out, the projected

number--210,000 visitors per year—equates to approximately 310 visitors per day.

Nothing in the record indicates to the Court that an increase of this size would make new

development reasonably foreseeable.

In sum, the Trustees did not act arbitrarily or capriciously in failing to consider

indirect effects or cumulative impacts that were not reasonably foreseeable.  Therefore,

they are entitled to summary judgment on this cause of action.

**Fourth Cause of Action/Relief Requested**

GRN seeks the following relief :  (1) a declaration that the Federal Trustees violated

NEPA and OPA by approving the lodge/conference center; (2) "Declare unlawful and set

aside the Record of Decision as it relates to the [lodge/conference center];" (3) "Declare

unlawful and set aside the Project Stipulation, as it relates to approving the

[lodge/conference center];" (4) Order the Federal Trustees to withdraw their approval of

the "lodge/conference center];"  (5) "Enjoin the Federal Trustees and Commissioner Guy

from taking any action in furtherance of the [lodge/conference center] until the Federal

Trustees comply with the law;" and (6) award attorney fees and costs.  In a separate cause

of action, GRN asserts its right to prospective injunctive relief against Commissioner Gunter

Guy, the designated Implementing Trustee.

GRN has prevailed on their claim that the Trustees failed to conduct a NEPA/OPA

alternatives analysis with respect to the allocation of $58.5 million in BP early restoration

funds to partially fund the lodge/conference center.  The Court can, and will, enjoin the use

of those funds pending further review by the Trustees.[10]   However, based on the administrative record before it, and the narrow issue presented by the pleadings, the Court cannot enjoin the Commissioner or the State from building the lodge/conference center with funds other than early restoration funds.

The Court will withhold ruling on GRN's request for attorney's fees and costs pending further briefing.  Within thirty days of the date of this order, GRN may file a properly supported motion, including citation to authority permitting the award of fees and costs as well as documentation supporting the hours expended and the hourly rate charged.  A briefing schedule will be entered after the motion is filed.

**Conclusion**

Summary judgment is **granted** in favor of GRN as to the OPA/NEPA claim, asserted in the First Cause of Action, that the Trustees acted arbitrarily and capriciously by failing to conduct a proper alternatives analysis.  Summary judgment is **granted** in favor of the Trustees on the remaining causes of action.  Judgment will be entered by separate order.

**DONE** and **ORDERED** this the 16th day of February, 2016.


s/*Charles R. Butler, Jr.*
**Senior United States District Judge**

---

[10] GRN has not requested injunctive relief with respect to the remaining portion of early restoration funds allocated to the Gulf State Park Enhancements Project.